FAY ARFA, A LAW CORPORATION
Fay Arfa, Attorney - SBN 100143
10100 Santa Monica Blvd., #300
Los Angeles, CA  90067
Tel.: (310) 841-6805
Fax: (310) 841-0817
fayarfa@sbcglobal.net

Attorney for Defendant
ENRIQUE CONTRERAS

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | No. 19-cr-00257 RGK |
|  | **EMERGENCY MOTION TO REDUCE SENTENCE. 18 U.S.C. § 3582(c)(1)(A)(i) [COMPASSIONATE RELEASE]; EXHIBITS** |
| **Plaintiff,** | |
| v. | |
| **ENRIQUE CONTRERAS,** | Hon. Judge R. Gary Klausner |
| **Defendant.** | Telephonic Hearing Requested |

TO: THE HONORABLE CHIEF JUDGE OF THE UNITED STATES
DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA:

Defendant ENRIQUE CONTRERAS, through counsel, respectfully

requests that he be compassionately released from prison because of the

global Coronavirus (COVID-19) pandemic sweeping the world.  18 U.S.C. §

3582(c)(1)(A).  COVID-19 places 40-year-old Mr. Contreras' already

compromised health and life in danger if he remains incarcerated.

1

1

2

3

4

5

     Mr. Contreras seeks to modify his term of imprisonment to permit him to serve the remainder of his custodial sentence in home detention to protect him from contracting the deadly COVID-19 and potentially infecting other prisoners and prison personnel.

6

7

8

     Mr. Contreras bases his motion on this Notice, this Motion, the attached exhibits, the case file and any argument of counsel.

9

DATED: April 14, 2021

10

11

                     Respectfully submitted,
FAY ARFA, A LAW CORPORATION

12

/s Fay Arfa

13

_____

14

Fay Arfa, Attorney at Law

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# STATEMENT OF THE CASE

Mr. Contreras pled guilty to Bribery Concerning Programs Receiving Federal Funds (18 U.S.C. § 666(a)(2) (Count 1); Subscribing to False Tax Return (26 U.S.C. § 7206(1) (Count 2).  On July 27, 2020, the district court sentenced him to 24 months in prison and three years of supervised release. (Dkt. 9, 37)

# ARGUMENT

## MR. CONTRERAS' MEDICAL CONDITION JUSTIFIES HIS COMPASSIONATE RELEASE

### A.    Introduction

Mr. Contreras moves for an order reducing his sentence to time served under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling circumstances." Mr. Contreras' medical conditions place him at a higher risk of severe illness or death from COVID-19.   Mr. Contreras suffers from asthma and takes prescription prednisone tablets. (Ex. B at 7, 11, 14, 18, 45, 58) Mr. Contreras has had a history of cardiac problems. (Ex. B at 41, 63, 74) He also suffers from hypertension.  (Ex. B at 15, 47, 67, 69, 80, 115)

The district court sentenced and remanded Mr. Contreras on July 20, 2020. Five months later, on December 17, 2020, Mr. Contreras was exposed to a COVID-19 inmate and, on December 23, 2020, Mr. Contreras contracted COVID-19. (Ex. B at 11, 15)

"The COVID-19 pandemic is extraordinary and unprecedented in

modern times in this nation." *United States v. Hernandez*, No. 18-cr-00834, 2020 U.S. Dist. LEXIS 58739, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020).

The COVID-19 pandemic and its outbreak within the Federal Bureau of Prisons (BOP), combined with Mr. Contreras' health conditions, make him especially vulnerable to serious disease or death if he contracts COVID-19. Mr. Contreras' extraordinary circumstances, combined with the sentencing factors set forth in 18 U.S.C. § 3553(a), support a grant of compassionate release.

## B.    The COVID 19 Pandemic

The 2019 COVID-19 pandemic has killed thousands, sickened millions, and disrupted the stability and security of billions worldwide. As of April 3, 2021, 130,528,722 cases have been reported worldwide. https://coronavirus.jhu.edu/.  Globally, 2,841,906 people have died. https://coronavirus.jhu.edu/.

The United States has suffered 30,633,368 COVID -19 cases and about 554,405 people in the United States have died.  *Id.*

## C.    The Law

"[A] court may not modify a term of imprisonment once it has been imposed" except pursuant to statute. *United States v. Kachina,* 2020 U.S. Dist. LEXIS 87341, 2020 WL 2539270, at *1 (D. Minn. May 19, 2020) (citing

18 U.S.C. § 3582(c)); see also *United States v. McIndoo*, No. 1:15-CR-00142 EAW, 2020 U.S. Dist. LEXIS 80487, at *2 (W.D.N.Y. May 6, 2020). The compassionate release provision, as amended by the First Step Act, is such a statutory exception. 18 U.S.C. § 3582(c)(1)(A).

The First Step Act amended 18 U.S.C. § 3582(c)(1)(A) with the goal of increasing "the use and transparency of compassionate release" and the section now allows defendants to petition district courts directly for compassionate release. *United States v. Stephenson*, 2020 U.S. Dist. LEXIS 89591, 2020 WL 2566760, at *2 (S.D. Iowa May 21, 2020). Previously, defendants could only petition the BOP Director, who could then make a motion, at his or her discretion, to the district court. See U.S. Sentencing Guidelines Manual ("USSG") § 1B1.13 cmt. n.4 (U.S. Sentencing Comm'n 2018).

The amended provision provides, "[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant . . . may reduce  the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements

issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)

Although the statute does not define "extraordinary and compelling reasons," Congress authorized the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The Commission enumerates several "extraordinary and compelling reasons" justifying a reduction of sentence, including the "medical condition of the defendant," the defendant's "age" and "family circumstances." USSG 1B1.13 cmt. n.1(A)-(C).

An inmate's medical condition alone may be sufficiently extraordinary and compelling under § 3582(c)(1)(A). USSG § 1B1.13 cmt. 1(A)(i) (noting that the condition must be "serious and advanced with an end of life trajectory" or "substantially diminish the ability of the inmate to provide self-care" within the facility and be one "from which he or she is not expected to recover."). Alternatively, an inmate's serious medical condition "in combination with" additional factors may also justify compassionate release. USSG§ 1B1.13 cmt. n.1(A)-(D).

On April 8, 2021, the Ninth Circuit held that ". . . the current version of U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13 is not an 'applicable policy statement[] issued by the Sentencing Commission' for motions filed by a defendant under the recently amended § 3582(c)(1)(A)." *United States v.*

*Aruda,* No. 20-10245, 2021 U.S. App. LEXIS 10119, at *2 (9th Cir. Apr. 8, 2021) The Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding. [Citation]." *United States v. Aruda*, No. 20-10245, 2021 U.S. App. LEXIS 10119, at *10.

### D.    Mr. Contreras Exhausted His Administrative Remedies

Before January 11, 2021, and on January 26, 2021 and January 29, 2021, Contreras filed a request for relief under the Compassionate Release Program. (See, Ex. A at 2-4) Because the warden did not make a decision within 30 days, Mr. Contreras has satisfactorily pursued his administrative remedies. [1] 18 U.S.C. § 3582(c)(1)(A).

### E.    The Massive Number of COVID-19 Cases in the Federal Correctional Facilities, including at MDC Los Angeles, FCI, Justifies Mr. Contreras' Release

As of April 2, 2021, the BOP has 126,196 federal inmates in BOP-managed institutions and 13,828 inmates in community-based facilities. (Ex. C at 184) The BOP staff complement is approximately 36,000.  (Ex. C at 184) As of April 2, 2021, 376 federal inmates and 1,270 BOP staff nationwide have confirmed positive test results for COVID-19 nationwide. Two hundred and twenty eight federal inmates have died from COVIC-19 and four BOP

---

[1]    The warden eventually denied Mr. Contreras' petition on March 4, 2021 more than 30 days after Contreras filed his request. (Ex. A at 5)

staff members have died from COVID-19 disease.

https://www.bop.gov/coronavirus/. (Exh. C at 184)

As of April 2, 2021, at the MDC in Los Angeles, where Mr. Contreras lives, one inmate has died, 293 inmates have recovered and 78 staff members have recovered.  (Exh. C at 183) As of April 2, 2021, 553 inmates have been tested, one has a pending test, and 272 inmates have tested positive for COVID-19. (Ex. C at 186)

## F.    The Unique Challenges of Correctional Facilities

"People in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19, because of close living arrangements with other people. The virus is thought to spread mainly from person-to-person, through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or be launched into the air and inhaled into someone's lungs. It is possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes; however, this is not the most likely way the virus spreads."  (Exh. D at 199)

"Anyone who has close contact with a person with COVID-19 will need to stay away from other people for at least 14 days to make sure they aren't sick as well. This means that they will be placed in a room separate from others, or just with other people who have also been exposed to the same sick

person. During this time, they will be checked for COVID-19 symptoms. If testing is available, a person in quarantine may be tested several times until medical staff  are  sure they do not have the virus."  (Ex. D at 200)

"Congregate settings, including correctional and detention facilities, are characterized by a diverse and varying set of factors that affect exposure to and transmission of COVID-19. In particular, incarcerated/detained persons exiting quarantine prior to 14 days may not be able to comply with the mitigation measures necessary to reduce the risk of post-quarantine transmission (e.g., mask-wearing, physical distancing) . . ." (Ex. D at 205)

". . . .  "[W]hile experts learn more about the protection that COVID-19 vaccines provide under real-life conditions, CDC continues to strongly recommend for correctional and detention facilities, as well as their surrounding communities, to continue using all the tools available to help stop transmission, like continue to wear a mask, stay at least 6 feet (two arm lengths) away from others (social distancing), avoid crowds and poorly ventilated spaces, and wash your hands often if soap and water aren't available, use hand sanitizer containing at least 60% alcohol. Together, COVID-19 vaccination and following CDC's recommendations for How To Protect Yourself and Others will offer the best protection from getting infected and from spreading COVID-19 to others."  (Ex. D at 203)

"Experts are working to learn more about how long a person who has

received the COVID-19 vaccine has immunity against getting infected and whether the vaccine can decrease the chances that an infected person can spread the virus. CDC will continue to update guidance as more is learned about the duration of immunity and the impact of the vaccine on transmission of SARS-CoV-2, the virus that causes COVID-19. Until we have more information, it is important that all people – even people who have received the COVID-19 vaccine – continue to practice additional prevention strategies." (Ex. D at 203)

### G.   Mr. Contreras' Suffers from Debilitating Health Conditions

#### 1.   *Mr. Contreras' Hypertension*

Mr. Contreras suffers from hypertension.  (Exh. B at 15, 47, 67, 69, 80, 115) Hypertension runs in Contreras' family and his 37-year-old brother died of hypertension.  (Exh. B at 45, 54, 63; Exh. F[2] at 230 ¶ 85).

#### 2.   *Mr. Contreras' Asthma*

Mr. Contreras has suffered from asthma since childhood and has been using an Abuterol inhaler and other medications. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; (Exh. B at 7, 11, 14, 18, 45, 58; Exh. D at 196, 197, 232).

---

[2] Exh. F is the Presentence Report - Doc 34 fled 7/21/2020.

https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discover y/hospitalization-underlying-medical-conditions.html (Ex. B at 7, 11, 14, 18, 45, 58; Ex. D at 196, 197, 232).

   3.    *Mr. Contreras Suffers from Anxiety and Panic Attacks.*

   Mr. Contreras has a "'reported a history of depression and panic disorder as well as a history of being medicated for these complaints. He described his panic attacks as feeling 'like a heart attack' and included symptoms of: hyperventilation, trouble breathing, extreme worry or fear, trouble concentrating, and memory difficulties. He indicated these occur typically about once per month or more. He was prescribed Buspar "a long time ago" reportedly over 10 years and has been taking it consistently'." (Ex. B at 16, 45, 47, 55, 83, 115; see also, Exh. F at 232 ¶ 110).

   4.    *Mr. Contreras Already Contracted COVID-19 in Prison*

   In December 2020, Mr. Contreras contracted COVID 19.  (Ex. B at 11, 15) He suffered a persistent productive cough and congestion and fatigue. The BOP Health Services placed him on Azithromycin.  (Ex. B at 7, 11, 14, 19) Mr. Contreras previously had been prescribed  Budesonide/Formoterol for asthma, lOS busPIRone for anxiety and panic disorder  and hydroCHLOROthiazide for hypertension. (Ex. B at 16)

   ", , , Contreras suffers from hemorrhoids, asthma, bronchospasm, hypertension, gastroesophageal reflux disease, ulcers, migraines, seizures,

and arthritis. He is awaiting evaluation for brain function due to seizures and memory loss, as well as for heart disease, as he was diagnosed with an irregular heartbeat in 2018 (verified by copies of hospital summaries)." (Exh. F at 232 ¶ 108).

### H.    Mr. Contreras' Debilitating Health Conditions Justify His Compassionate Release from Incarceration

Mr. Contreras' medical conditions, in combination with the risk posed by COVID-19 at MDC, Los Angeles FCI, warrant compassionate release.  The particular risk COVID-19 poses for those who suffer from Mr. Contreras' medical conditions warrant his release.  The CDC has warned those who suffer from hypertension and asthma have a higher risk of becoming severely ill and dying from COVID-19.  (Ex. D at 188, 190-191, 193-194, 196)

### I.    United States District Court Decisions Support Mr. Contreras' Compassionate Release

The heightened dangers from COVID-19 posed to Mr. Contreras, in light of his health concerns, constitute extraordinary and compelling reasons to order his immediate release from MDC, Los Angeles FCI. United States District Courts have released people who suffer from the same maladies as Mr. Contreras, namely, Hypertension and Asthma.  See *United States v. Hansen*, No. 17-cr-50062, 2020 WL 2219068 (N.D. Ill. May 7, 2020) ("[T]he Court cannot discount the risk to Hansen if he contracts coronavirus, as reliable information places him in a higher-risk category. Specifically, the

presentence report documents that he suffers from diabetes, hypertension, high cholesterol, kidney disease, and chronic obstructive pulmonary disease, all of which are confirmed risk factors for serious illness if one contracts coronavirus."); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (shortening 60-month sentence after only 21 months because Amarrah's "Type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea, and asthma" put him a substantial risk should he contract COVID-19 even though facility had no reported cases); *United States v. Howard*, No. 4:15-cr-00018-BR, 2020 WL 2200855 (E.D.N.C. May 6, 2020) (finding 52-year-old with "chronic obstructive pulmonary disease ('COPD'), Type II diabetes, obesity, Stage 3 kidney disease, edema, open wounds on his legs, and a diaphragmatic hernia" demonstrated extraordinary and compelling circumstances due to COVID-19);  *United States v. Quintero*, No. 08-cr-6007L, 2020 WL 2175171 (W.D.N.Y. May 6, 2020) (granting compassionate release to man who "suffers from diabetes, a compromised immune system, obesity, and hypertension," "which make him more susceptible than another to contract the virus.").

**J.   The Section 3553(a) Sentencing Factors Support Mr. Contreras' Release**

Mr. Contreras accepted early responsibility and pleaded guilty on May 21, 2019. On July 27, 2020, Judge Klausner remanded him into custody. As of April 5, 2021, he has served about eight months, or about 40%, of a 24-month

1   sentence.  According to the BOP, his release date is April 8, 2022.

2   Mr. Contreras worked hard to provide for his wife and family.  In 2002, he
3   married Melissa and had three children, Enrique, Jr., Irelan, and Daisy.
4
5   Enrique and Melissa bought the Tel-Pro company from Melissa's stepfather,
6   paid off the high debts, and made it profitable. (Exh. F at 228 ¶ 75). The
7   company provided infrastructure for telecommunications and business office
8
9   support.  At the time of Mr. Contreras' plea, the company employed thirty
10  people. (Exh. F at 234 ¶ 115).

11  Before sentencing, Mr. Contreras paid "every penny of restitution,"
12  namely $822,000.  (Ex. G at 246)  At sentencing, Mr. Contreras submitted
13
14  numerous character letters that reflected Enrique's broad network of support,
15  including family, friends, and profession colleagues. All attested to his
16  devotion to family, his past altruistic acts, his commitment to self-
17
18  improvement, and his helpfulness to others. (Exh. F at 230- 232 ¶¶ 84-106;
19  Ex. G at 248) He anonymously donated money to someone so they could have
20  a medical operation.  (Ex. G at 248)

21  Section 3582(c)(1)(A) requires a court to consider the sentencing factors
22  set forth in 18 U.S.C. § 3553(a) before granting compassionate release.
23
24  Section 3553(a) requires the Court to consider: (1) "the nature and
25  circumstances of the offense and the history and characteristics of the
26  defendant"; (2) the need for the sentence to reflect the seriousness of the
27

28                                          14

offense, promote respect for the law, provide just punishment, and provide

rehabilitative opportunities and care to the defendant; (3) the kinds of

sentences available; (4) the sentencing range as set by the USSG; (5) any

pertinent policy by the United States Sentencing Commission; (6) the need to

avoid unwarranted sentencing  disparities among similarly situated

defendants; and (7) the need for restitution to any victims.

Guideline Section 1B1.13(2) provides that compassionate release is

appropriate when "the defendant is not a danger to the safety of any other

person or to the community, as provided in 18 U.S.C. § 3142(g)[.]"

On April 8, 2021, the Ninth Circuit recently held that ". . . the current

version of U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13 is not an

'applicable policy statement[] issued by the Sentencing Commission' for

motions filed by a defendant under the recently amended § 3582(c)(1)(A)."

*United States v. Aruda,* No. 20-10245, 2021 U.S. App. LEXIS 10119, at *10.

The Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a

district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but

they are not binding. [Citation]." *Id.*

The section 3553(a) sentencing factors support Mr. Contreras' release,

particularly, "the need for the sentence imposed . . . to provide the defendant

with . . . medical care . . . in the most effective manner." 18 U.S.C. §

3553(a)(2)(D).

**K.     The Court Should Grant Mr. Contreras' Request for Compassionate Release**

At Mr. Contreras' July 28, 2020 sentencing hearing, even though defense counsel raised the issue of COVID-19, the district court apparently overlooked Mr. Contreras' high risk of contracting COVID-19.  The district court focused on Mr. Contreras' restitution payments but, at sentencing, did not mention that he considered Mr. Contreras' health or the COVID-19 pandemic. (Ex. G at 254) At sentencing, the district court sentenced him to 24 months because "of the disparate sentencing that is involved, and also because of the tact that the defendant has paid [or will pay] full restitution – or basically full restitution in the matter before his sentencing."  (Ex. G at 255-257)

Mr. Contreras did contract COVID-19 during his incarceration and he still has a high risk of contracting the deadly disease.  Mr. Contreras has already suffered from COVID-19 and is a high-risk for again suffering from COVID-19. Because inmates in detention facilities are particularly vulnerable to infection, Mr. Contreras has demonstrated extraordinary and compelling reasons for compassionate release. His institution suffers from an ongoing outbreak of cases. Mr. Contreras suffers from multiple serious medical conditions which significantly diminish his ability to provide self-care in MDC Los Angeles. See *United States V. Colvin,* 2020 U.S. Dist. LEXIS 57962, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020)

1    The district court did not adequately consider the Section 3553(a)

2    factors. Mr. Contreras' current characteristics have mitigated the serious

3    nature and circumstances of his offenses. Mr. Contreras' sentence served to

4    date and his medical conditions, will deter him from criminal conduct, protect

5    the public, and promote respect for the law.

6    Mr. Contreras has financial resources, a place to live, a supportive

7    family, and transportation.  If released, Mr. Contreras would live with his

8    spiritual and religious family, including his wife, four children, sister and

9    parents.[3]  (Ex. E at 209) He will attend weekly religious services. (Ex. E at

10   209)

11   Mr. Contreras has "skills and training in construction,

12   telecommunications systems, camera systems, alarm systems, and structured

13   cabling." (Exh. F at 233 ¶ 112)  He earned more than twenty certificates in

14   such areas as technical training, fiber optics, communications server, asbestos

15   awareness, network cabling systems, OASIS installer training, and enterprise

16   structured cabling.  (Exh. F at 233-234 ¶ 113)

17   Mr. Contreras would comply with court orders and any terms of his

18   supervised release. If Mr. Contreras fails to follow any condition of release,

---

[3]      Contreras would live with his wife, son and two daughters in his four bedroom and three and one-half  bathroom home. Contreras' parents, his sister, and her two young daughters live in the 1200 square foot two bedroom, two bathroom guest house. (Exh. F at 229 ¶ 81).

this Court could appropriately sanction him. Because of his serious medical conditions, the nature of his offense, his release plans, and the length of time already served, Mr. Contreras will not pose a threat to the community.

## CONCLUSION

Mr. Contreras respectfully requests that he be released from custody and placed on supervised release in home detention with his wife, children, sister and parents.

DATED: April 14, 2021

Respectfully submitted,
FAY ARFA, A LAW CORPORATION

/s Fay Arfa

_____

Fay Arfa, Attorney at Law

18

# EXHIBIT A

TRULINCS 78117112 - CONTRERAS, ENRIQUE - Unit: LOS-E-S

--------------------------------------------------------------------------------

FROM: 78117112
TO: Warden
SUBJECT: ***Request to Staff*** CONTRERAS, ENRIQUE, Reg# 78117112, LOS-E-S
DATE: 01/26/2021 01:36:23 PM

To: WZ Jenkins
Inmate Work Assignment: dorm orderly/visitation

Hello and good afetrnoon, Thank you for the reply back. I submitted a letter and form from my attorney for compassionate release the first week of January 2021 to the on duty Correctional Officer here at 5South, He said for me to put it in the mailbox so I did in an envelope with attention Warden, it was a white envelope with a form and a letter form Myself, it had all my information on it. Did the letter/envelope get lost? Thank You for your time

**0002**

TRULINCS  78117112 - CONTRERAS, ENRIQUE - Unit: LOS-E-S

------------------------------------------------------------------------------------------------

FROM: Warden
TO: 78117112
SUBJECT: RE:***Inmate to Staff Message***
DATE: 01/26/2021 12:32:03 PM

There is no record of your request for compassionate release being received in the Warden's Office.  Thank you.

>>> ~^!"CONTRERAS, ~^!ENRIQUE" <78117112@inmatemessage.com> 1/11/2021 10:04 AM >>>
To: WZ Jenkins
Inmate Work Assignment: 5 south Orderly

Good morning, I was wondering if you received my letter for compassionate release. Thank You and have a great day.

**0003**

TRULINCS  78117112 - CONTRERAS, ENRIQUE - Unit: LOS-E-S

----------------------------------------------------------------------------------------------

FROM: 78117112
TO: Warden
SUBJECT: ***Request to Staff*** CONTRERAS, ENRIQUE, Reg# 78117112, LOS-E-S
DATE: 01/26/2021 01:36:23 PM

To: WZ Jenkins
Inmate Work Assignment: dorm orderly/visitation

Hello and good afetrnoon, Thank you for the reply back. I submitted a letter and form from my attorney for compassionate release the first week of January 2021 to the on duty Correctional Officer here at 5South, He said for me to put it in the mailbox so I did in an envelope with attention Warden, it was a white envelope with a form and a letter form Myself, it had all my information on it. Did the letter/envelope get lost? Thank You for your time

**0004**

TRULINCS 78117112 - CONTRERAS, ENRIQUE - Unit: LOS-E-S

--------------------------------------------------------------------------------

FROM: Warden
TO: 78117112
SUBJECT: RE:***Inmate to Staff Message***
DATE: 03/04/2021 02:32:02 PM

Mr. Contreras, this is in response to your electronic request, wherein you request for Immediate Home Confinement and/or Compassionate Release based on Medical Circumstances. Specifically, you contend you suffer from multiple medical complications to include; walking pneumonia, asthma, high blood pressure, and abnormal heart findings. You state your medical condition causes you to be high risk while you are incarcerated due to the COVID-19 virus.

A review of your records reveals you were sentenced to 24 months with three years of supervision to follow for Bribery Concerning Programs Receiving Federal Funds. You have a Low Risk Recidivism Level and a Home Detention Eligibility Date of January 26, 2022. You have a projected release date of April 08, 2022, via Good Conduct Time Release.

Title 18 of U.S. Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the Bureau of Prisons (BOP), to reduce a term of imprisonment for extraordinary or compelling reasons. In accordance to the BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 USC 3582(c)(1)(A) and 4205(g), your petition has been evaluated consistent with national policy.

We reviewed your current request for home confinement under the CARES Act in the context of COVID-19, and we still did not find you to meet the criteria as outlined in the Attorney General's directive issued March 26, 2020 and April 3, 2020 and the Assistant Director's memo dated November 16, 2020. More specifically, you are currently scored with a "Low" PATTERN score. Priority for release to home confinement under the CARES Act is reserved for non-violent offenders who are housed at a minimum or low security facility and who have "Minimum" PATTERN score. Thus, we support the decision to not recommend you for home confinement under the CARES Act at this time.

In reference to your request on reduction in sentence, the BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates. We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus. However, your concern about being potentially exposed to, or possibly contracting COVID-19 coupled with your alleged medical conditions does not currently warrant placement in regards to reduction in sentence under the CARES Act.

If you are dissatisfied with this response, you may appeal this decision through the Administrative Remedy Process by submitting your concerns on the appropriate form, Request for Administrative Remedy (BP-9), within 20 days of the receipt of this response.

>>> ~^!"CONTRERAS, ~^!ENRIQUE" <78117112@inmatemessage.com> 1/29/2021 8:29 AM >>>
To: Mr. Perkins
Inmate Work Assignment: Visiting Orderly

Dear Warden Jenkins,

**0005**

# EXHIBIT B

# Bates Stamped pages 6-181 SEALED

Pending Application to File Under Seal

# EXHIBIT C

**LOS ANGELES MDC**

| Facility | Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|---|
| Los Angeles MDC | 0 | 8 | 1 | 0 | 293 | 78 |

## COVID-19 Vaccine Implementation

The Bureau of Prisons (BOP) is working with the Centers for Disease Control and Prevention (CDC) and the Federal Government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed), to ensure the BOP remains prepared to receive and administer the COVID-19 vaccine as it is made available. The BOP has received 107,675 doses and administered 110,489 doses of the COVID-19 vaccine.

**Total Doses Distributed**

# 107,675

**Total Doses Administered**

# 110,489

**Learn more about vaccinations and view individual facility stats +**

# COVID-19 Cases

04/02/2021 - The BOP has **126,196** federal inmates in BOP-managed institutions and **13,828** in community-based facilities. The BOP staff complement is approximately **36,000**. There are **376 federal inmates** and **1,270 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **46,881** inmates and **5,485** staff have recovered. There have been **228** federal inmate deaths and **4** BOP staff member deaths attributed to COVID-19 disease. Of the inmate deaths, **4** occurred while on home confinement.

Due to the rapidly evolving nature of this public health crisis, the BOP will update the open COVID-19 confirmed positive test numbers, recoveries, and the number of COVID-19 related deaths each weekday at 3:00 p.m. The positive test numbers are based on the most recently available **confirmed lab results**

000184

*[Mouseover facility markers for more information. Zoom in to densely clustered marker areas to see additional locations.]*

# COVID-19 Inmate Test Information

### Completed Tests
## 109,062
Number of inmates who have completed testing.

### Pending Tests
## 365
Number of inmates with pending tests and no previous completed test.

### Positive Tests
## 46,463
Number of inmates that have ever had a positive test.

### About the Data

These data are compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. **Not all tests are conducted by and/or reported to BOP.** The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility.

4/3/2021

BOP: COVID-19 Update

| Facility Name ▲ | No. of Inmates with Completed Tests | No. of Inmates with Pending Tests | No. of Inmates with Positive Tests |
|---|---|---|---|
| KALAMAZOO PROB ENHANCEMENT PRO (BATTLE CREEK, MI) (RRC) | 1 | 0 | 1 |
| KALAMAZOO PROB ENHANCEMENT PRO (KALAMAZOO, MI) (RRC) | 1 | 0 | 1 |
| KINTOCK RRC (NEWARD, NJ) (RRC) | 11 | 0 | 11 |
| LA TUNA FCI | 922 | 0 | 542 |
| LAKE REGION LAW ENFORCEMENT CE (DEVILS LAKE, ND) (RRC) | 2 | 0 | 2 |
| LEAVENWORTH USP | 1478 | 0 | 866 |
| LEE USP | 1164 | 0 | 530 |
| LEIDEL SANCTION CENTER (HOUSTON, TX) (RRC) | 14 | 2 | 13 |
| LEWISBURG USP | 906 | 26 | 162 |
| LEXINGTON FMC | 1158 | 0 | 745 |
| LOMPOC FCI | 841 | 0 | 596 |
| LOMPOC USP | 964 | 4 | 253 |
| LORETTO FCI | 789 | 0 | 629 |
| LOS ANGELES MDC | 533 | 1 | 272 |
| LUTHERAN SOCIAL SERVICES (EAU CLAIRE, WI) (RRC) | 2 | 0 | 2 |
| MANCHESTER FCI | 1012 | 0 | 558 |
| MARIANNA FCI | 672 | 0 | 349 |
| MARION USP | 1252 | 0 | 776 |
| MCCREARY USP | 869 | 0 | 190 |
| MCDOWELL FCI | 1113 | 0 | 358 |
| MCKEAN FCI | 997 | 0 | 491 |
| MEMPHIS FCI | 948 | 0 | 371 |
| MENDOTA FCI | 518 | 3 | 81 |
| MIAMI FCI | 733 | 5 | 242 |
| MIAMI FDC | 1034 | 20 | 144 |
| MID-VALLEY HOUSE (EDINBURG, TX) (RRC) | 18 | 1 | 18 |
| MIDWAY REHAB CENTER, KNOXVILLE (KNOXVILLE, TN) (RRC) | 2 | 0 | 2 |
| MILAN FCI | 893 | 0 | 256 |
| MIRROR, INC. (WICHITA, KS) (RRC) | 5 | 0 | 5 |
| MIRROR, INC., THE (TOPEKA, KS) (RRC) | 1 | 0 | 1 |
| MONTGOMERY FPC | 361 | 0 | 115 |
| MORGANTOWN FCI | 401 | 0 | 226 |
| NEIL J. HOUSTON HOUSE (PAWTUCKET, RI) (RRC) | 4 | 0 | 4 |
| NEW YORK MCC | 464 | 29 | 44 |
| NWRRC (PORTLAND, OR) (RRC) | 2 | 0 | 2 |
| OAKDALE I FCI | 828 | 1 | 180 |
| OAKDALE II FCI | 923 | 16 | 390 |
| OKLAHOMA CITY FTC | 993 | 0 | 300 |
| ORIANA HOUSE (CLEVELAND, OH) (RRC) | 2 | 0 | 2 |
| ORION RRC (VAN NUYS, CA) (RRC) | 8 | 0 | 8 |
| OTERO COUNTY PRISON FACILITY (CHAPARRAL, NM) (RRC) | 1 | 0 | 1 |
| OTISVILLE FCI | 473 | 1 | 65 |
| OXFORD FCI | 909 | 0 | 689 |

**000186**   9/12

# EXHIBIT D

000187

# What You Need to Know about COVID-19 if You are Incarcerated/Detained

## COVID-19



- COVID-19 is an illness caused by a new virus (SARS-CoV-2) that can spread from person to person and has spread across the world.
- Many people who have COVID-19 do not feel sick.
- For those who do feel sick, some signs and symptoms of COVID-19 include:

  » Fever/chills
  » Cough
  » Feeling tired
  » Having a hard time breathing
  » Pain in the head or body

  » Loss of taste or smell
  » Sore throat
  » Stuffy or runny nose
  » Nausea/vomiting
  » Diarrhea

## How COVID-19 Spreads



- The virus spreads through droplets in the breath ("respiratory droplets") when a person with COVID-19 breathes, coughs, sneezes, talks, or sings within about 6 feet (two arm lengths) of other people.

  » Respiratory droplets containing the virus can land in the mouth, nose, or eyes of people who are close by.

  » Sometimes, droplets may stay in the air for minutes to hours and infect someone more than 6 feet away.

- People may also be able to get the virus by touching something with the virus on it, then touching their mouth, nose, or eyes.

## People at Risk For COVID-19



- Anyone can get infected.
- Older adults and people with certain medical problems tend to get sicker with COVID-19. Some of these medical problems include:

  » Cancer
  » Chronic kidney disease
  » Chronic obstructive pulmonary disease (COPD)
  » Sickle cell disease

  » Heart problems
  » Obesity
  » Smoking
  » Type 2 diabetes mellitus



**U.S. Department of**
**Health and Human Services**
Centers for Disease
Control and Prevention

CS321182A     November 10, 2020

000188

# What You Can Do to Reduce Exposure

- Try to stay at least 6 feet (two arm lengths) from others, especially people from a different housing unit. For example, try to stay at least 6 feet apart from others at mealtimes or when you use the bathroom.
- As much as possible, wear a mask that covers your nose and mouth, especially if you will be within 6 feet of another person.
- Wash your hands often with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating; before and after preparing food; and before taking medicine.
  - » If available, you can also use a hand sanitizer that contains at least 60% alcohol; cover your hands with sanitizer and rub them together until they feel dry.
- Cough and sneeze into your elbow or a tissue, and throw the tissue in a trash can.
- Avoid sharing eating utensils, dishes, and cups.
- If possible, go outside for your recreation time so you can more easily stay at least 6 feet apart from others.
- Try to sleep opposite, sleep head to foot when multiple beds are in a room. This gives you more space between your face and others around you.
- Inform visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

# If You Were Near Someone with COVID-19

- You may be tested for the virus with a swab in your nose, even if you don't feel sick.
- You may be sent to a quarantine area. This is so if you get sick, you can get medical care and so you don't get others sick. Quarantining is not to punish you or because you are in trouble. You may be quarantined alone or with others who were near someone with COVID-19 to protect you and others.

# What to Do if You Feel Sick

- Tell a correctional officer or staff member if you feel sick.
- You may be sent to medical isolation. This is so you can get medical care and so you don't get others sick. Medical isolation is not to punish you.
- You may be tested for the virus with a swab in your nose.
  - » If you infected with the virus, you may be told to stay in the medical isolation area.
  - » If you aren't infected with the virus, you may be sent back to your normal housing unit.

# If you have further questions or concerns

Your local or state health department is a great resource if you have questions or concerns.

# Websites with More Information:

- COVID-19 Wear a Mask: www.cdc.gov/coronavirus/2019-nCoV/index.html
- COVID-19 in Correctional and Detention Facilities: www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/
- To find our state health department name and phone number: www.cdc.gov/publichealthgateway/healthdirectories/healthdepartments.html
- To find your local health department name and phone number: www.naccho.org/membership/lhd-directory



Harvard Health Publishing
**HARVARD MEDICAL SCHOOL**
*Trusted advice for a healthier life*

🛒 CART | FREE HEALTHBEAT SIGNUP | SHOP ▼ | SIGN IN

[ Pay My Bill » ]   What can we help you find? 🔍

| HEART HEALTH | MIND & MOOD | PAIN | STAYING HEALTHY | CANCER | DISEASES & CONDITIONS | MEN'S HEALTH | WOMEN'S HEALTH | LICENSING |

Home » Harvard Health Blog » Hypertension, health inequities, and implications for COVID-19 - Harvard Health Blog

# Hypertension, health inequities, and implications for COVID-19

POSTED NOVEMBER 18, 2020, 10:30 AM

 Hanna Gaggin, MD, MPH
Contributor

 Kemar Brown, MD
Contributor

The COVID-19 pandemic has led many people to forego follow-up and treatment of chronic health conditions such as hypertension (high blood pressure). It is now quite evident that people with hypertension are also more likely to develop severe complications from the coronavirus. In the US, African Americans and other racial and ethnic minorities, including Hispanics and Native Americans, are more likely to have hypertension, and consequently have been disproportionately affected by the COVID-19 pandemic.



### What is the link between high blood pressure and heart disease?

Hypertension is the most common modifiable risk factor for major cardiovascular events including death, heart attack, and stroke, and it plays a major role in the development of heart failure, kidney disease, and dementia. Over the past few decades, major efforts have been launched to increase awareness and treatment of hypertension.

Hypertension increases stress on the heart and arteries as well as on other organs including the brain and kidneys. Over time, this stress results in changes that negatively impact the body's ability to function. To reduce these negative effects on the heart, medications are typically prescribed when blood pressure goes above 140/90 for those without significant cardiovascular risk, or above 130/80 in people with known coronary artery disease or other coexisting diseases like diabetes.

### Certain groups are disproportionately affected by hypertension and severe COVID-19

According to a recent study published in *JAMA*, the proportion of study participants with controlled blood pressure (defined as < 140/90 mm Hg) initially increased and then held steady at 54% from 1999 to 2014. However, the proportion of patients with controlled blood pressures subsequently declined significantly, to 44% by 2018. Further, certain subgroups appeared to have a disproportionately higher rate of uncontrolled hypertension: African Americans, uninsured patients, and patients with Medicaid, as well as younger patients (ages 18 to 44) and older patients (ages 75 and older). An accompanying editorial noted that the prevalence of uncontrolled blood pressure was disproportionately higher in non-Hispanic Black adults from 1999 to 2018.

With a higher prevalence of hypertension, African American, Native American, and Hispanic communities have had higher rates of hospitalization and death during the pandemic, according to the CDC. While vulnerability to severe complications of COVID is highest among older patients regardless of race or ethnicity and socioeconomic circumstance, according to the National Bureau of Economic Research, "vulnerability based on pre-existing conditions collides with long-standing disparities in health and mortality by race-ethnicity and socioeconomic status."

### How does hypertension result in severe COVID-19 complications?

The link between hypertension and severe coronavirus disease remains complex. Some experts believe that uncontrolled blood pressure results in chronic inflammation throughout the body, which damages blood vessels and results in dysregulation of the immune system. This results in difficulty fighting the virus, or a dangerous overreaction of the immune system to COVID-19. Certain classes of blood pressure medicines (ACE inhibitors and angiotensin receptor blockers, or ARBs) were initially thought to worsen infection, but this has since been disproven. Several research groups have shown that with close monitoring, these medications are safe to use during COVID infection.

### What do people with hypertension need to know about reducing their risk?

000190

Proper blood pressure control has long-term health benefits and may help prevent severe COVID-19 symptoms. Therefore, we strongly encourage taking your medications as directed and following healthy lifestyle practices like regular exercise, achieving and maintaining a healthy weight, following a low-sodium, heart-healthy diet such as the <u>Mediterranean diet</u>, and reducing stress and practicing mindfulness.

In addition, following up with your doctor to keep blood pressure under control is more important now than ever. While the idea of heading into the hospital or a doctor's office in the middle of a pandemic may put people on edge, many hospitals and clinics are quite safe due to appropriate safety measures like universal mask wearing and social distancing. Many have also expanded telemedicine or virtual visits for patients.

## What can we do to tackle inequities in healthcare delivery?

COVID-19 has forced us to confront inequities in health care delivery that contribute to worse clinical outcomes in vulnerable patient groups.

With rising numbers of people with uncontrolled blood pressure, and the pandemic disrupting management of chronic health conditions, this may serve as a prime opportunity for us to purposefully change the current trends in hypertension and narrow the gap in health inequity. Potential areas of focus include:

- promoting research on how the COVID-19 pandemic has affected management of chronic diseases like high blood pressure
- identifying barriers to care, particularly in vulnerable subgroups
- increasing awareness of the importance of chronic disease management, particularly in communities where health care inequities exist
- innovating to make virtual health technology more broadly accessible
- delivering additional resources for chronic disease management to vulnerable subgroups
- implementing long-term policy solutions to address health inequities.

*Follow us on Twitter* <u>@HannaGaggin</u> *and* <u>@kemar_MD</u>.

## Related Information: <u>Controlling Your Blood Pressure</u>

<u>Print</u>

## Related Posts:

<u>Could white-coat hypertension harm your heart?</u>

<u>Aggressive hypertension treatment does not lead to…</u>

<u>COVID-19: If you're older and have chronic health…</u>

<u>Promoting equity and community health in the…</u>

<u>Driving equity in health care: Lessons from COVID-19</u>

| COMMENTS | TOPICS |
|---|---|
| 0 | <u>Coronavirus and COVID-19</u> \| <u>Health care disparities</u> \| <u>Hypertension and Stroke</u> |

Commenting has been closed for this post.



<u>Sign up for HEALTHbeat</u> \| <u>Digital Subscriptions</u> \| <u>Special Health Reports</u> \| <u>Print Subscriptions</u> \| <u>Customer Service</u> \| <u>About Us</u> \| <u>Permissions</u>

<u>Do Not Sell My Personal Information</u> \| <u>Privacy Policy</u>



© 2010 - 2021 Harvard University. All rights reserved.

**000191**

 Centers for Disease Control and Prevention




**WEAR A MASK**


**STAY 6 FEET APART**


**AVOID CROWDS**


**GET A VACCINE**

# People with Certain Medical Conditions

Updated Mar. 29, 2021          Print



This information is intended for a general audience. Healthcare providers should see Underlying Medical Conditions Associated with High Risk for Severe COVID-19 for more detailed information.

# Overview

Adults of any age with **the following conditions can be more likely to get severely ill** from COVID-19. **Severe illness** means that a person with COVID-19 may need:

- Hospitalization
- Intensive care
- A ventilator to help them breathe
- Or they may even die

In addition:

- Older adults are more likely to get severely ill from COVID-19. More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45.
- **Long-standing** systemic health and social inequities have put people from many racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19. Studies have shown minority groups are also dying from COVID-19 at younger ages. People in minority groups are often younger when they develop chronic medical conditions and may be more likely to have more than one condition.

If you have a medical condition, **speak with your healthcare provider** about steps you can take to manage your health and risks.

Preventive measures for COVID-19 (including vaccination, wearing a mask and social distancing) are important especially if you are older or have multiple or severe health conditions. You can learn about CDC's COVID-19 vaccine recommendations, including how medical conditions and other factors inform recommendations, here.

## COVID-19 Vaccines Information for Specific Groups

000192

Vaccine information for older adults, long-term care facility residents, people with underlying medical conditions, people at high risk for severe illness, people with disabilities, and more.

COVID-19 Vaccine Information

**Note:** The list below does not include all potential medical conditions that could make you more likely to get severely ill. Rare medical conditions may not be included below. However, a person with a condition that is not listed may still be in more danger from COVID-19 than persons of similar age who do not have the condition and should talk with their healthcare provider.

# Medical Conditions in Adults

- This list is presented **in alphabetical order** and not in order of risk.
- CDC completed an evidence review process **for each** medical condition on this list to ensure they met criteria for inclusion on this webpage.
- We are learning more about COVID-19 every day, and this list may be updated as the science evolves.

## Cancer

Having cancer **can make you more likely** to get severely ill from COVID-19. Treatments for many types of cancer can weaken your body's ability to fight off disease.  At this time, based on available studies, having a history of cancer may increase your risk.

Get more information:

- Cancer | CDC
- American Cancer Society: What People with Cancer Should Know about Coronavirus ⧉

## Chronic kidney disease

Having chronic kidney disease of any stage **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Chronic kidney disease | CDC
- National Kidney Foundation: Kidney disease and COVID-19 ⧉

## Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension

Chronic lung diseases **can make you more likely** to get severely ill from COVID-19. These diseases may include:

- Asthma, if it's moderate to severe
- Chronic obstructive pulmonary disease (COPD), including emphysema and chronic bronchitis
- Having damaged or scarred lung tissue such as interstitial lung disease (including idiopathic pulmonary fibrosis)
- Cystic fibrosis, with or without lung or other solid organ transplant
- Pulmonary hypertension (high blood pressure in the lungs)

Get more information:

- COPD | CDC

- Asthma | CDC
- American Lung Association: Controlling Chronic Lung Diseases Amid COVID-19 ⬈

## Dementia or other neurological conditions

Having neurological conditions, such as dementia, **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Dementia | CDC
- Alzheimer's Association: COVID-19, Alzheimer's and Dementia ⬈

## Diabetes (type 1 or type 2)

Having either type 1 or type 2 diabetes **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Diabetes | CDC
- American Diabetes Association: How COVID-19 Impacts People with Diabetes ⬈

## Down syndrome

Having Down syndrome **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Down syndrome | CDC
- National Down Syndrome Society: COVID-19 and Down Syndrome ⬈

## Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)

Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Heart Disease | CDC
- COVID-19 | American Heart Association ⬈

## HIV infection

Having HIV (Human Immunodeficiency Virus) **can make you more likely** to get severely ill from COVID-19.

Get more information:

- HIV Infection | CDC
- National Institutes of Health: Special Considerations in People With HIV infection ⬈

## Immunocompromised state (weakened immune system)

Having a weakened immune system **can make you more likely** to get severely ill from COVID-19. Many conditions and treatments can cause a person to be immunocompromised or have a weakened immune system. Primary immunodeficiency is caused by genetic defects that can be inherited. Prolonged use of corticosteroids or other immune weakening medicines

can lead to secondary or acquired immunodeficiency.

Get more information:

- Types of Primary Immune Deficiency Diseases 🔗
- The Jeffrey Modell Foundation 🔗
- Immune Deficiency Foundation 🔗

## Liver disease

Having chronic liver disease, such as alcohol-related liver disease, nonalcoholic fatty liver disease, and especially cirrhosis, or scarring of the liver, **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Liver Disease | NIDDK (nih.gov) 🔗
- American Liver Foundation: Your Liver & COVID-19 🔗

## Overweight and obesity

Overweight (defined as a body mass index (BMI) > 25 kg/m$^2$ but < 30 kg/m$^2$), obesity (BMI ≥30 kg/m$^2$ but < 40 kg/m$^2$), or severe obesity (BMI of ≥40 kg/m$^2$), **can make you more likely** to get severely ill from COVID-19.  The risk of severe COVID-19 illness increases sharply with elevated BMI.

Get more information:

- Obesity | CDC
- Obesity, Race/Ethnicity, and COVID-19 | CDC
- Obesity Action Coalition: COVID-19 and Obesity 🔗

## Pregnancy

Pregnant people **are more likely** to get severely ill from COVID-19 compared with non-pregnant people.

Get more information:

- Pregnant People | CDC
- Toolkit for Pregnant People and New Parents | CDC
- Investigating the Impact of COVID-19 during Pregnancy | CDC

## Sickle cell disease or thalassemia

Having hemoglobin blood disorders like sickle cell disease (SCD) or thalassemia **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Sickle Cell Disease | CDC
- Thalassemia | CDC

## Smoking, current or former

Being a current or former cigarette smoker **can make you more likely** to get severely ill from COVID-19. If you currently smoke, quit. If you used to smoke, don't start again. If you've never smoked, don't start.

Get more information:

- Smoking & Tobacco Use | CDC
- How to Quit Smoking | Quit Smoking | Tips From Former Smokers | CDC
- Health Benefits of Quitting Smoking | CDC

## Solid organ or blood stem cell transplant

Having had a solid organ or blood stem cell transplant, which includes bone marrow transplants, **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Transplant Safety | CDC
- COVID-19 Resources for Transplant Community ⧉

## Stroke or cerebrovascular disease, which affects blood flow to the brain

Having cerebrovascular disease, such as having a stroke, **can make you more likely** to get severely ill from COVID-19.

Get more information:

- Stroke | CDC
- COVID19 Stroke Podcast Series for Patients and Caregivers ⧉

## Substance use disorders

Having a substance use disorder (such as alcohol, opioid, or cocaine use disorder) **can make you more likely** to get severely ill from COVID-19.

Get more information:

- How to Recognize a Substance Use Disorder ⧉
- Learn more about people who use drugs or have Substance Use Disorder and COVID-19

## COVID-19

While children have been less affected by COVID-19 compared with adults, children can be infected with the virus that causes COVID-19 and some children develop severe illness. Children with underlying medical conditions are at increased risk for severe illness compared to children without underlying medical conditions. Current evidence on which underlying medical conditions in children are associated with increased risk is limited. Current evidence suggests that children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19. Similar to adults, children with obesity, diabetes, asthma or chronic lung disease, sickle cell disease, or immunosuppression can also be at increased risk for severe illness from COVID-19. One way to protect the health of children is to ensure that all adults in a household are fully vaccinated against COVID-19.

- Children, Teens, and Young Adults | CDC
- COVID-19 Parental Resources Kit | CDC

## Actions You Can Take

In general, the older you are, the more health conditions you have, and the more severe the conditions, the more important it is to take preventive measures for COVID-19 such as vaccination, wearing a mask , social distancing, and practicing hand hygiene. Please contact your state, tribal, local, or territorial health department for more information on COVID-19 vaccination in your area.

**000196**

It is important for people with medical conditions and their providers to work together and manage those conditions carefully and safely. **Get a COVID-19 vaccine when you are eligible.** If you have a medical condition, the following are actions you can take based on your medical conditions and other risk factors:

- **Continue your medicines** and do not change your treatment plan without talking to your healthcare provider.
- **Follow your current treatment plan** (e.g., Asthma Action Plan, dialysis schedule, blood sugar testing, nutrition and exercise recommendations) to keep your medical condition under control.
- **Have at least a 30-day supply** of prescription and non-prescription medicines. Talk to a healthcare provider, insurer, and pharmacist about getting an extra supply (i.e., more than 30 days) of prescription medicines, if possible, to reduce your trips to the pharmacy.
- **Have shelf-stable food choices available** to accommodate dietary needs based on your medical condition (e.g., kidney diet and KCER 3-Day Emergency Diet Plan ⧉ , diabetic diet).
- **Know the triggers** for your condition and avoid when possible (e.g., avoid asthma triggers by having another member of your household clean and disinfect your house for you or avoid possible sickle cell disease triggers to prevent vaso-occlusive episodes or pain crises).
- **Learn about** stress and coping. You may feel increased stress during this pandemic. Fear and anxiety can be overwhelming and cause strong emotions.
- **Do not delay getting emergency care for your medical condition** because of COVID-19. Emergency departments have infection prevention plans to protect you from getting COVID-19 if you need care.
- **Call your healthcare provider if you have any concerns** about your medical conditions or if you get sick and think that you may have COVID-19. If you need emergency help, call 911 right away.
- **When possible, keep preventive care and other routine healthcare appointments** (such as vaccinations and blood pressure checks) with your provider. Check with your provider about safety precautions for office visits and ask about telemedicine or remote healthcare visit options.

Last Updated Mar. 29, 2021

## What do medical staff need to know about caring for a person with COVID-19 in my facility? ⌄

Facilities should ensure that incarcerated individuals receive medical evaluation and treatment at the first sign of COVID-19 symptoms. Staff evaluating and providing care for confirmed or suspected COVID-19 cases should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations. Facilities without on-site healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care. Facilities should have a plan in place to safely transfer persons with complications from COVID-19 to a local hospital if they require care beyond what the facility is able to provide. When evaluating and treating persons with symptoms of COVID-19 who do not speak English, provide a translator when possible. Spanish and Simplified Chinese materials are available for those who need them.

## What steps do I need to take to implement quarantine in my facility? ⌄

Close contacts of a sick person (who have been within about 6 feet of the sick person or have had direct contact with infectious droplets, such as from a cough or sneeze) should be placed under quarantine for 14 days to determine if they develop symptoms. CDC has developed guidance on quarantining close contacts of people with COVID-19. Be sure to monitor symptoms twice a day and move anyone developing symptoms to medical isolation right away, after ensuring that they are wearing a face mask. Individuals under quarantine should stay within the quarantine space, including when eating their meals, using the bathroom, and receiving medical evaluation. Laundry of people in quarantine can be washed with the laundry of others. Individuals handling laundry should wear recommended PPE, should not shake the laundry, and should clean their hands often.

Ideally, people under quarantine due to contact with a COVID-19 case should be housed individually. If separate spaces in a facility are not available, refer to CDC's full guidance document for correctional and detention centers for other options. People at high risk for complications of COVID-19 (older adults, people with severe underlying chronic medical conditions) should not be housed with other quarantined people if at all possible. Facilities without enough space or without onsite healthcare capacity should coordinate with local public health officials.

Individuals in quarantine can be released from quarantine back to their previous housing arrangement in the facility if they have not developed symptoms during the 14-day time period.

## Staff at Correctional and Detention Facilities

### How can I lower the chance that I will get COVID-19? ⌄

The best way to prevent illness is to take steps to avoid being exposed to this virus. Start by ensuring you and others around you use everyday preventive actions (such as washing hands often, avoiding touching your eyes, nose, and mouth, and covering your cough). Read How to Protect Yourself to learn more.

If there is spread of COVID-19 in the community close to the facility, you will be asked daily about symptoms over the last 24 hours and any contact you had with someone infected with COVID-19 in the last 14 days. Your temperature will also be checked daily.

### Do I have a greater chance of getting COVID-19? ⌄

Staff and people incarcerated in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19, because of the close living arrangements inside the facility. The virus is thought to spread mainly from person-to-person, through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs. It may be possible that

a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes, but this is not thought to be the main way the virus spreads. This is why washing your hands regularly and avoid close contact with other people when possible prevents illness.

## What should I do if I think I may be sick with COVID-19? ⌄

If you think you have been exposed to COVID-19 and develop a fever or symptoms of respiratory illness, such as cough or difficulty breathing, stay home. If you are at work, alert your supervisor right away and go home. Read What To Do if You Are Sick to learn more.

## What does it mean to be in quarantine? ⌄

Anyone who has close contact with a person with COVID-19 will need to stay away from other people for at least 14 days to see whether symptoms develop. If you are a close contact of a person with COVID-19, you should self-quarantine at home by staying in a separate room away from others. Read Caring for Yourself at Home and What To Do if You Are Sick to learn more.

# People in Prison or Jail

## What do I need to know about COVID-19? ⌃

For information on what you need to know about COVID-19, please visit What You Need to Know about COVID-19 if You are Incarcerated/Detained 🗎 [PDF – 253 KB] | Spanish version 🗎 [PDF – 227 KB]

## How can I lower the chance that I will get COVID-19? ⌃

The best way to prevent illness is to take steps to avoid being exposed to this virus. Start by ensuring you and others around you use everyday preventive actions (such as washing hands often, avoiding touching your eyes, nose, and mouth, and covering your cough). Read How to Protect Yourself to learn more.

## Do I have a greater chance of getting COVID-19? ⌃

People in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19, because of close living arrangements with other people. The virus is thought to spread mainly from person-to-person, through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or be launched into the air and inhaled into someone's lungs. It is possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes; however, this is not the most likely way the virus spreads.

## What should I do if I think I may be sick with COVID-19? ⌃

If you think you have been exposed to COVID-19 and develop a fever or symptoms of respiratory illness, such as cough or difficulty breathing, alert facility staff right away to make sure you receive medical care and protect the people around you from being exposed to the virus.

## What does it mean to be in quarantine? ⌃

Anyone who has close contact with a person with COVID-19 will need to stay away from other people for at least 14 days to make sure they aren't sick as well. This means that they will be placed in a room separate from others, or just with other people who have also been exposed to the same sick person. During this time, they will be checked for COVID-19 symptoms. If testing is available, a person in quarantine may be tested several times until medical staff are sure they do not have the virus.

## Is it ok for people to visit me? ⌃

Anyone who has had flu-like symptoms in the last 24 hours or has been in contact with someone who has or is suspected to have COVID-19 in last 14 days should not visit a correctional or detention facility. All visitors will be screened for symptoms and contact with someone with COVID-19. Staff will also perform temperature checks on all visitors. Visitors should contact the facility about their rules on visits before they travel. If a person in the facility has COVID-19, visitors may not be allowed to enter the facility. Instead, non-contact visits can be used, when possible.

# People Being Released from Prison and Jail

## When I get out of prison or jail during the COVID-19 pandemic (worldwide disease outbreak), what steps should I take to protect myself and others from COVID-19? ⌄

You may have received a COVID-19 test in prison or jail. **If you test negative**, you *probably* were not infected at the time they took your sample. The test result only means that you did not have COVID-19 at the time of testing. Also, you may have been exposed to COVID-19 between the time you were last tested and the time you got out. So, you should stay away from others (quarantine) as much as you can for 14 days after release to protect yourself and others. Visit Test for current infection.

If you get sick with COVID-19 during the 14 days you are staying away from others, ask for a COVID-19 test. If you do not have a doctor, contact a health center or health department. See how under the next question: "After I get out of prison or jail, where can I get help during the COVID-19 pandemic?"

Symptoms of COVID-19 include

| | |
|---|---|
| Fever/chills | Loss of taste or smell |
| Cough | Sore throat |
| Feeling tired | Stuffy or runny nose |
| Having a hard time breathing | Nausea/vomiting |
| Pain in the head or body | Diarrhea |

*During quarantine* it is best to stay alone in a private living space, if you can, to avoid contact with other people. Ideally, your space should include your own bedroom and bathroom. Before you are released, contact friends or family to find a place to stay. If you cannot find space with family or friends, find homeless shelters in the area.

If you can find housing before you are released, set up a space with clothing, food, medicine, cleaning supplies, and any other items you may need while in quarantine. Get things that will help protect you and others from getting COVID-19 once you are released. Items include face masks, hand sanitizer, soap, and paper towels, or a cloth towel that only you use or that you change often. Visit COVID-19 prevention link to learn more about how to protect yourself and others.

 Centers for Disease Control and Prevention



# COVID-19 Vaccine FAQs in Correctional and Detention Centers

Updated Feb. 16, 2021        Print

The following are frequently asked questions about COVID-19 vaccination in correctional and detention centers. For general information about COVID-19 vaccine, please see the CDC COVID-19 Vaccine Information page.

Information about COVID-19 vaccines is rapidly evolving. Please check back regularly for updated information.

## Does the CDC coordinate COVID-19 vaccination plans for correctional and detention centers nationwide?

CDC worked with the Federal Bureau of Prisons to develop its vaccination implementation plan and will continue to offer guidance regarding modifications as needed over time. However, CDC does not determine plans for allocating, distributing, or administering vaccines for state or local correctional and detention centers. CDC works closely with health departments and partners to optimize vaccination planning, sub-prioritization of vaccination within recommended populations, and implementation of COVID-19 vaccination programs to best administer vaccines. These FAQs are intended to guide state and local planning efforts.

## Should staff at correctional and detention facilities be offered a COVID-19 vaccine?

Correctional and detention facility staff have high risk work-related exposures to SARS-CoV-2 because their work-related duties must be performed on site and involve being in close proximity (<6 feet) to other people. CDC recommends the COVID-19 vaccine for staff at correctional and detention facilities because these staff are at higher risk of exposure to COVID-19 in the workplace. Evidence supporting vaccination in frontline essential workers is described in the Evidence Table for COVID-19 Vaccines Allocation in Phases 1b and 1c of the Vaccination Program.

Correctional and detention facility staff will receive state or local vaccination plans. For workers employed by contract firms or temporary help agencies, the staffing agency and the host employer are joint employers and, therefore, **both** are responsible for providing and maintaining a safe work environment. If planning to offer vaccination at the worksite, employers should do whatever is feasible to offer vaccination to all individuals working at the worksite, regardless of their status as a contract or temporary employee.

## How will persons who are incarcerated or detained be prioritized for COVID-19 vaccination?

State and local correctional facilities will receive vaccines according to their jurisdiction's vaccination plan. The prioritization of correctional staff and incarcerated persons differ by jurisdiction, and jurisdictions may still be in the process of specifying priority groups.

Jurisdictions are encouraged to vaccinate staff and incarcerated/detained persons of correctional or detention facilities **at the same time** because of their shared increased risk of disease. Outbreaks in correctional and detention facilities are often difficult to control given the inability to physically distance, limited space for isolation or quarantine, and

limited testing and personal protective equipment resources. Incarcerated or detained persons living in correctional and detention facilities may also be older or have high-risk medical conditions that place them at higher risk of experiencing severe COVID-19. COVID-19 outbreaks in correctional and detention facilities may also lead to community transmission.

Vaccinating staff and incarcerated/detained persons at the same time may also be more feasible than sequential vaccination of correctional or detention subpopulations. If it's not feasible to vaccinate all staff and incarcerated or detained persons at the same time, sub-prioritization planning for vaccination within this group may be necessary based on facility-level or individual-level factors (such as, older age or having an underlying medical condition), or both, and should be coordinated with state and local health departments (see bullet below "How should facilities deal with insufficient vaccine doses made available to correctional and detention centers?" for details). Visit your state health department websites for the most recent information.

## How do correctional and detention facilities receive COVID-19 vaccinations?                    ⌃

Correctional and detention centers can differ widely by facility size, location (e.g., rural), and presence of medical staff; all of these factors may impact accessibility to COVID-19 vaccinations. Larger correctional or detention facilities with medical staff may be able to vaccinate incarcerated/detained persons and staff directly. These providers should enroll in their jurisdiction's COVID-19 vaccination program and complete the program provider agreements to receive vaccine shipments. Smaller facilities, such as jails located in remote areas, are more likely to experience difficulty accessing medical services and resources necessary for the planning, allocation, distribution, and administration of COVID-19 vaccinations. Any facility that has not received information regarding COVID-19 vaccinations should contact their local and/or state health officer.

Multiple vaccine administration strategies may be needed to reach a variety of different correctional and detention facilities. Facilities with medical staff can enroll to become COVID-19 vaccine providers and directly vaccinate their staff and residents. Mobile vaccination teams from local health departments, contracted correctional and detention facility healthcare providers, community healthcare systems, commercial pharmacies, or traveling nurse groups may be needed to reach smaller or more remote correctional and detention facilities.

## How should facilities deal with insufficient vaccine doses made available to correctional and detention centers?                    ⌃

COVID-19 vaccination plans in correctional facilities should include considerations for how to sub-prioritize vaccination in the event there is not enough vaccine at a given time. Sub-prioritization planning for vaccination may occur at the facility level, individual level, or both, and should be coordinated with state and local health departments. Sub-prioritization decisions can be guided by facility- and individual-level data and should take into consideration the feasibility of subpopulation vaccination across multiple facilities versus facility-based vaccination. Jurisdictions are encouraged to consider vaccination of both staff and incarcerated/detained persons of correctional or detention facilities **at the same time** because of their shared increased risk of disease and the efficiency of vaccinating more people in the same place.

Facility-level indicators that may be helpful for vaccination sub-prioritization include:

1. the number of staff and incarcerated/detained persons;
2. proportion of older staff and incarcerated/detained persons with high-risk medical conditions that increase the risk of COVID-19 morbidity and mortality;
3. baseline healthcare infrastructure;
4. facility ventilation;
5. ease of access by vaccination teams;
6. ability to continue normal operations in the event of staff quarantine after exposures; and

000202

7. ability to isolate and quarantine incarcerated/detained persons if an outbreak occurs.

Individual-level factors that may be helpful for vaccination sub-prioritization include older age, high-risk medical conditions, recent COVID-19 in the past 90 days, and risk of exposure to other incarcerated/detained persons who have COVID-19.

The risk for severe illness increases with age, with older adults at highest risk. Adults of any age with certain underlying medical conditions are also at increased risk for severe illness from COVID-19. As such, according to the Advisory Committee on Immunization Practices (ACIP) updated interim vaccine allocation recommendations, COVID-19 vaccines should be offered to frontline workers and adults who are 75 years of age or older (Phase 1b), as well as persons aged 65–74 years and persons aged 16–64 years with medical conditions that increase risk of severe illness due to COVID-19 (phase 1c). Correctional and detention facilities, especially those with geriatric and medical units, should coordinate with state/local health officials on how to sub-prioritize staff and incarcerated/detained persons that fall into these two sub-categories when it is not feasible to vaccinate all incarcerated/detained persons and staff at the same time.

CDC has published a companion guide to assist state, tribal, local, and territorial immunization programs and other immunization partners in planning for vaccination of populations recommended to receive initial doses of COVD-19 vaccine.

### If an incarcerated/detained person is boarded in another state will he/she still receive the COVID-19 vaccine? ⌃

The facility that is boarding the incarcerated/detained person is responsible for offering, administering, and documenting the COVID-19 vaccine. Vaccination should be documented in the Immunization Information System of the jurisdiction where the vaccination occurred. Vaccination cards are filled out at the time of vaccination with the date of vaccine, vaccine type, and location of vaccination. This vaccination card should be transferred with the incarcerated/detained person and provided to them upon release. If there are questions or concerns, consult with federal, state, and/or local public health authorities.

### Should correctional settings continue to practice additional prevention strategies (e.g., wearing masks, social distancing) after vaccine has been administered? ⌃

Yes, while experts learn more about the protection that COVID-19 vaccines provide under real-life conditions, CDC continues to strongly recommend for correctional and detention facilities, as well as their surrounding communities, to continue using **all the tools** available to help stop transmission, like continue to wear a mask, stay at least 6 feet (two arm lengths) away from others (social distancing), avoid crowds and poorly ventilated spaces, and wash your hands often if soap and water aren't available, use hand sanitizer containing at least 60% alcohol. Together, COVID-19 vaccination and following CDC's recommendations for How To Protect Yourself and Others will offer the best protection from getting infected and from spreading COVID-19 to others.

Experts are working to learn more about how long a person who has received the COVID-19 vaccine has immunity against getting infected and whether the vaccine can decrease the chances that an infected person can spread the virus. CDC will continue to update guidance as more is learned about the duration of immunity and the impact of the vaccine on transmission of SARS-CoV-2, the virus that causes COVID-19. Until we have more information, it is important that all people – **even people who have received the COVID-19 vaccine** – continue to practice additional prevention strategies.

### How can we ensure that persons who are incarcerated or detained receive all recommended COVID-19 vaccine doses? ⌃

Current COVID-19 vaccine series consist of two doses, with the second dose administered either 3 weeks (Pfizer) or 4 weeks (Moderna) after the first dose. As part of enumeration and planning, correctional facilities and state/local health

COVID-19

should anticipate potential challenges in second dose vaccination among persons who qualify for early release or who are transferred. Additionally, correctional and detention facilities should work with the jurisdiction to use reminder/recall functionality of the electronic immunization recordkeeping tools available to them in their jurisdiction.

State/local health officials and correctional and detention facilities should ensure that persons who will be released from custody before the second dose is due are linked to community vaccination resources [↗] and have vaccination cards filled out at the time of vaccination with the first dose with the date of vaccination, vaccine type, and location of vaccination. Correctional facilities should provide this vaccination card upon release and encourage released persons to seek vaccination from community vaccination providers. Locations of community COVID-19 vaccine providers will be available on VaccineFinder [↗] as more vaccine is made available to the general population.

Some states may prioritize persons who are incarcerated to receive vaccination during phase 1. In those states, incarcerated/detained persons may have earlier access to the vaccine than others in their surrounding communities. Without establishing a linkage to care between a trusted health authority in the correctional facility and a local health clinic, community providers may not believe the formerly incarcerated person has actually received the first vaccine dose and may deny them the second dose. Considering the stigma associated with incarcerated persons, CDC recommends that correctional facilities coordinate with local health officials and community health clinics in preparation for the possibility of formerly incarcerated persons needing a second dose prior to the general population.

## How do correctional or detention facilities prepare in the management of potential vaccine adverse events? ⌄

An adverse event is any health problem that happens after a shot or other vaccine. An adverse event might be truly caused by a vaccine, or it might be pure coincidence. Serious adverse events after COVID-19 vaccination are uncommon, but cases of anaphylaxis, or an acute and potentially life-threatening allergic reaction, have been reported after vaccination. Correctional facilities should ensure there is space, supplies, and staff to observe for and manage anaphylaxis after COVID-19 vaccination.

CDC currently recommends that persons without contraindications to vaccination who receive an mRNA COVID-19 vaccine be observed after vaccination for the following time periods:

- 30 minutes: Persons with a history of an immediate allergic reaction of any severity to a vaccine or injectable therapy and persons with a history of anaphylaxis due to any cause.
- 15 minutes: All other persons

COVID-19 vaccine adverse event should be reported to the Vaccine Adverse Event Reporting System (VAERS) [↗] . This national system collects these data to look for adverse events that are unexpected, appear to happen more often than expected, or have unusual patterns of occurrence.

Last Updated Feb. 16, 2021

000204





# Recommendations for Quarantine Duration in Correctional and Detention Facilities

Updated Mar. 18, 2021        Print

# Summary of Recent Changes

Updates as of March 18, 2021                                                                                    ⌃

- Clarification that fully vaccinated incarcerated/detained persons should continue to use a 14-day quarantine period and be tested for SARS-CoV-2 following exposure to suspected or confirmed COVID-19.

## COVID-19

Additional information on testing and travel after being fully vaccinated.

View Previous Updates

On December 2, 2020, CDC released options that health departments could use to shorten COVID-19 quarantine periods within their jurisdictions. These options were intended to reduce the personal, community and operational burden of quarantine with the understanding that so doing balances reduced burden against a small possibility of spreading the virus. These options were developed based on models which estimated the remaining risk of transmission based on individual quarantine where the exposed individual could physically separate and stay isolated from others during the quarantine period and could strictly adhere to mitigation measures if released from quarantine prior to 14 days.

Congregate settings, including correctional and detention facilities, are characterized by a diverse and varying set of factors that affect exposure to and transmission of COVID-19. In particular, incarcerated/detained persons exiting quarantine prior to 14 days may not be able to comply with the mitigation measures necessary to reduce the risk of post-quarantine transmission (e.g., mask-wearing, physical distancing). So, models that estimated the remaining risk of reducing quarantine duration do not apply to correctional/detention facility settings. Failure to detect early post-quarantine transmission can result in a repeated cycle of medically isolating infected people and quarantining their close contacts, placing an even higher operational burden on the staff and further stretching limited healthcare resources and space constraints. Thus, the benefits of reducing quarantine duration are unlikely to outweigh the risks for additional transmission in correctional facilities already burdened by limited onsite healthcare services, as well as limited options for physical and social distancing. For this reason, CDC recommends continued use of a 14-day quarantine in correctional and detention facilities to minimize transmissions, illness and secondary clusters, and additional operational costs that could be incurred with shortened quarantine. This recommendation applies to both incarcerated persons as well as the staff of these facilities.

Facilities considering a shortened quarantine duration should do so in consultation with federal, state, tribes, territories, and local public health authorities and with an understanding of the risks. Employers/management should carefully weigh the risks of increased transmission and secondary clusters, and consider individual facility characteristics (e.g., level of community transmission, ability to maintain social distancing, compliance with universal masking policies, ability to properly ventilate, proportion of employees and incarcerated/detained people at increased risk for severe illness from COVID-19 and availability of resources for broad-based testing and outbreak response), before implementing a reduced quarantine option. If a reduced quarantine duration is implemented for staff, facility management should require staff to continue to self-monitor for

symptoms through day 14, immediately self-isolate if symptoms occur during the 14 days after exposure, and adhere to all recommended mitigation strategies during the full 14 days (e.g., mask wearing, social distancing, hand hygiene, cleaning and disinfection, and proper ventilation).

Refer to CDC guidance for correctional and detention facilities for further details regarding how to most effectively lower the risk of post-quarantine transmission.

# Vaccinated staff and incarcerated/detained persons in correctional and detention facilities

## Quarantine duration

### *Incarcerated/Detained persons*

Incarcerated/detained persons who are fully vaccinated (i.e., ≥2 weeks after receiving the second dose in a two-dose series [Pfizer-BioNTech or Moderna], or ≥2 weeks after receiving a single-dose vaccine [Johnson and Johnson/Janssen]) should continue to quarantine for 14 days and be tested for SARS-CoV-2 following an exposure to someone with suspected or confirmed COVID-19. This is because residential congregate settings, including correctional and detention facilities may face high turnover of residents, a higher risk of transmission, and challenges in maintaining recommended physical distancing.

If there is an urgent need to mitigate critical issues (e.g., lack of space or staff to care for exposed incarcerated/detained persons), facility management could consider waiving quarantine for fully vaccinated incarcerated/detained persons, though any applicable testing and symptom monitoring recommendations should still be followed. These decisions should be made in consultation with public health authorities and with an understanding of the residual risk of transmission.

### *Staff*

Fully vaccinated correctional staff who do not have symptoms do not need to quarantine following an exposure; however, testing following an exposure and through routine workplace screening programs (if applicable), as well as symptom monitoring, are still recommended.

More details can be found on the Interim Public Health Recommendations for Fully Vaccinated People website.

### *Staff who have recently traveled*

Travel increases a person's chance of getting and spreading COVID-19. Staff should follow CDC requirements and recommendations during and after travel. Staff should also follow recommendations and requirements of the country or U.S. state, tribal, local, or territorial health department at their destination. Those returning to work after travel (including domestic and international travel) should follow their employer's policies about return to work after travel.

Facilities considering a shortened quarantine for staff after travel to mitigate critical issues (e.g., lack of space or staff to care for exposed incarcerated/detained persons) should do so in consultation with federal, state, tribal, territorial, and/or local public health authorities and with an understanding of the risks.

# Previous Updates

## Updates from Previous Content ⌃

### As of January 19, 2021

A revision was made on 1/19/2021 to reflect the following:

- Clarification that correctional and detention facilities should continue to use a 14-day quarantine period.

# EXHIBIT E

**Pending Application to
File Redacted Copy**

## RELEASE PLAN QUESTIONNAIRE

**NAME:** Enrique Contreras          **DATE:** 12-22-2020

**ADDRESS:** ████████████████████████████████████

**Case Manager:** Ms Shu or ms Long

**Unit Manager:** Mr. MUSgray

Will you be on supervised release? How long?  Yes  3 years

Do you have identification?  CA driverse License

What identification documents do you need?  none yet

Do you have any financial resources? What are they?  Yes ████ in business checking and ████ in personal money, plus ████ a month once I go back on payroll

Where will you live?  Primary home, ████████████████████████████████

Is that the same/different place than where you were living when you went into prison?  Yes

Who will you live with?  Wife, 4 children, both Parents

How can we contact him/her?  Ingryd Contreras ████████████ Wife

Who are you closest to? (family, friend or other)  Wife  Ingryd Contreras

How can we contact him/her?  ████████ ████████

What support will you have when you get out of prison?  my Wife and Kids, my Parents. Spiritual Jehovahs Witnesses.

**REDACTED**                              **000208**

How can we contact him/her? _____

How do you know they are supportive? We are a very close family, They all need me and I them. We are also very spiritual and we all attend Jehovahs witnesses weekly meetings on zoom now

How did you help your family and friends before you went to prison? (taking care of children or others, help with transportation, etc.)
I Paid all the bills, mortgage utilities, dropped of kids to school, Homework, I Purchase most of the food we eat. I do most of cooking and cleaning with my wife, Transportation for my Parents, I do all the bidding for my company for new Projects and new Contracts.

How did your family and friends help you before you went to prison? (e.g., taking care of children, help with transportation or a shoulder to cry on?
Emotional and spiritual support, helped with kids

Will your family be able to provide support with housing? If you got sick, will there be someone who is able to take care of you? Will your family be able to provide assistance with food or childcare, if that is a concern? Yes my wife and both of my Parents.

Who in your family can provide help with housing, health, food, and childcare?
My wife and both my Parents.

Will you have transportation? (How will you get to work?) Yes, Company Commercial Pick up Truck.

List any health problems you have:

[REDACTED]

REDACTED                                    000209

What medications will you need? _mental health,_

Do you need mental health treatment? _Yes_

Do you need substance abuse treatment? _Not yet_

Are you disabled? If yes, how? ██████████████████████████
██████████████████████████

Did you receive disability, such as SSI or other benefits before you went to prison?
_No_

Were you on Medicaid before you went to prison? _No_

Did you have health insurance before you went to prison? _Yes_

What job skills do you have? _General Contractor, Electrical Contractor, Voice, Data, Audio Video Systems Integrator. Graduated from dozens of trade schools and manufacturers._

Do you have a job offer or prospects for a job? _Yes, self employed at EC properties Oasis Systems Integration_

Contact information: _Mike Vargas or Anita_ ██████████████

Please list any programs attended/completed and training obtained in prison:
_None. Zero available here at MDC LA_

REDACTED

**Please attach copies of any certificates, awards, transcripts, etc and list them here:**

See P SR report From John Rogers

If you started RDAP or Drug Education or another program but did not finish it, explain why you did not finish: None

Did you work in UNICOR? If yes, what job? Not available

Education (GED, College, Vocational training)? Trade schools, Manufacturer training.

Plans to continue education or training? Yes, Trade schools,

How will you support yourself until you have a job? ▮▮▮ in business CK Acct, Personal income is available once I get out.

Children (financial support and arrangements made)? Yes, my wife and parents are paying all bills and watching our kids.

What are your biggest concerns for when you get released? Take care of all my medical issues, Get back to work, win new contracts, Be there for my family Emotionally and Spiritually.

What are your greatest strengths/weaknesses? My health is my biggest weakness. The Love For my family and Love for God and loyalty to them are my strengths. The Love For my work and business aswell.

REDACTED                    000211

Do you have any detainers or outstanding charges?  If yes, what are the charges and where are they pending?  NO

Additional comments:

The doctors and nurses here at MDC LA are not providing me with addecuate health care. Conditions here are horrible, we always loose hot water and inadequate air flow in cells, we are locked in 24 hours a day For 14-21 days at a time For quarantine. I'm doing my 3rd or 4th quarantine now since I got here. We are running a Shu like program here at MDC LA. I'm suppose to be at Lompoc Camp but I got stuck here doing time with all Pre trials. Im a level 1 offender and I have 7 points.

Please have my outside doctor review my x rays they took here at MDC yesterday 12-21-2020. I feel like I have walking Pheumonia (I get it every year, I know what it feels like). The doctors here say I'm lying and making it up. These doctors are garbage here! He said unless I'm turning blue or dead thers nothing he can do. My wife Ingrid has my doctors info on the out side. I need a real doctor to review my chest x rays ASAP. We are going through another 2nd major covid outbreak now with majority of 70 inmates in my dorm tested possitive.

Also the Cares Act has home Confinement, Lots try every Possible Way we have to get me home early please, I don't mind doing my entire time left over on house arrest. This is the worse possible time to be in prison.

REDACTED                    000212

# EXHIBIT F

**Bates Stamped pages 213-240 SEALED**

Pending Application to File Under Seal

**000213**

EXHIBIT G

1             UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                WESTERN DIVISION

4                   - - -

5    HONORABLE R. GARY KLAUSNER, DISTRICT JUDGE PRESIDING

6

7   UNITED STATES OF AMERICA,      )
                              )
8         Plaintiffs,         )
                              )
9                           )
                              )
10        vs.                ) No. CR 19-00257-RGK
                              )
11                           )
                              )
12   ENRIQUE CONTRERAS,           )
                              )
13         Defendant.         )
    _____ )

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17              *SENTENCING HEARING*

18           LOS ANGELES, CALIFORNIA

19            MONDAY, JULY 27, 2020

20 _____

21            MARIA R. BUSTILLOS
         OFFICIAL COURT REPORTER
22            C.S.R. 12254
        UNITED STATES COURTHOUSE
23         350 WEST 1ST STREET
            SUITE 4455
24     LOS ANGELES, CALIFORNIA 90012
         (213) 894-2739

25

1                        **A P P E A R A N C E S**

2

3

4       **ON BEHALF OF THE PLAINTIFFS,**
        **UNITED STATES OF AMERICA:**        OFFICE OF THE UNITED STATES
5                                            ATTORNEY
                                            BY:  RUTH C. PINKEL
6                                            312 NORTH SPRING STREET
                                            11TH FLOOR
7                                            LOS ANGELES, CA 90012
                                            (213)894-6077
8

9
        **ON BEHALF OF THE DEFENDANTS,**
10      **ENRIQUE CONTRERAS:**              LAW OFFICES OF JOHN D.
                                            ROGERS
11                                          BY:  JOHN D. ROGERS, ESQ.
                                            4000 MACARTHUR BOULEVARD
12                                          EAST TOWER
                                            SUITE 615
13                                          NEWPORT BEACH, CA 92660
                                            (949)625-4487
14

15                                          LAW OFFICE OF PETER
                                            SEBASTIAN
16                                          BY:  PETER SEBASTIAN, ESQ.
                                            1801 CENTURY PARK EAST
17                                          24TH FLOOR
                                            LOS ANGELES, CA 90067
18                                          (310)281-2869

19

20

21

22

23

24

25

1                      **I N D E X**

2

3                                                        <u>PAGE</u>

4    SENTENCING HEARING:                                    4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

|    |    |
|----|----|
| 1  | LOS ANGELES, CALIFORNIA; MONDAY, JULY 27, 2020 |
| 2  | -o0o- |
| 3  | (COURT IN SESSION AT 10-:07 A.M.) |
| 4  | COURTROOM DEPUTY:  Calling calendar item number |
| 5  | four, CR 19-00257-RGK:  *United States of America v. Enrique* |
| 6  | *Contreras*.  Counsel, please, state your appearances. |
| 7  | MS. PINKEL:  Good morning, Your Honor. |
| 8  | Ruth Pinkel for the United States. |
| 9  | THE COURT:  Thank you, Counsel. |
| 10 | MR. ROGERS:  Good morning, Your Honor. |
| 11 | John Rogers on behalf of Mr. Contreras. |
| 12 | THE COURT:  Counsel? |
| 13 | MR. SEBASTIAN:  Good morning, Your Honor. |
| 14 | Peter Sebastian, also on behalf of Mr. Contreras. |
| 15 | THE COURT:  All right.  This is the time set for |
| 16 | sentencing.  If you're more comfortable where -- sitting |
| 17 | where you are rather than go to the podium, that's fine with |
| 18 | me.  So however you want to have it.  In this particular |
| 19 | matter, this is set for sentencing today.  The Court has read |
| 20 | and considered multiple documents:  The presentence report, |
| 21 | the defendant's position papers and the Government's position |
| 22 | papers.  Are there any papers that you have not submitted |
| 23 | that you would like me to look at before sentencing? |
| 24 | MR. ROGERS:  Not on behalf of the Defense, |
| 25 | Your Honor. |

000245

5

1          MS. PINKEL:  Your Honor, just for the record,

2     I'd like to state that the PSR which is docket 26, the

3     revised PSR which is docket 34 and the addendum which is

4     docket 35 --

5          THE COURT:  Yes, I did.

6          MS. PINKEL:  -- and I'm sure the Court reviewed

7     those three?

8          THE COURT:  Yeah.  Okay.  Counsel, do you wish

9     to be heard as far as sentencing is concerned?

10         MR. ROGERS:  Yes, Your Honor.

11         Thank you, Your Honor.

12         THE COURT:  Uh-huh.

13         MR. ROGERS:  Those same actions speak louder

14     than words.  Many defendants stand before this Court

15     begging for forgiveness in hopes of getting a lenient

16     sentence.  They're sorry.  They're apologetic; but many,

17     if not all of those, don't pay the restitution in

18     advance.  And Mr. Contreras is not like those other

19     individuals.  Mr. Contreras is paid $822,000 in advance

20     of sentencing and restitution.  And something like that

21     cannot go unnoticed.  That is worthy of consideration.

22     And even the Government agrees that that is an alternate

23     display of acceptance of responsibility beyond words.

24          In addition, Mr. Contreras cooperated

25     extensively with the Government.  He participated in six

000246

6

1    separate proffer sessions; and the subject of that was

2    discussed in the Defense's sentencing memorandum.

3         In addition, Your Honor, we are in the midst of

4    a pandemic with COVID-19.  Mr. Contreras suffers from

5    heart disease, asthma, as well as a host of medical

6    issues that make him very susceptible to the fatal

7    effects of COVID-19.  Many of the symptoms and many of

8    the medical issues that Mr. Contreras suffers from are

9    often what's quoted and argued for in compassionate

10   release motions in this court.  And many people count on

11   Mr. Contreras, his family, his friends and most

12   importantly, 30 employees that he tries as best he can

13   to get a check.  With Mr. Contreras gone, it's quite

14   certain that those 30 individuals who have 30 families

15   will not get a check in the in the midst of a pandemic.

16        He also looks out for his children and his

17   ailing father, and this case has been nothing but a

18   downward spiral for him.  He lost his marriage.  He's on

19   the verge of losing his business, and his children blame

20   him for the loss of the marriage; but he's worked hard

21   his whole life, and he's asking the Court to see that,

22   from collecting cans at a young age with his father to

23   pay rent to working with his now ex-wife to building a

24   multimillion-dollar business.  No one will ever come to

25   this court to say that Mr. Contreras is selfish or

 1    self-centered in any way.  Quite the contrary, this

 2    Court received 25 letters from individuals.  And what is

 3    very telling in one of those letters is that an

 4    individual says that Mr. Contreras anonymously donated

 5    money for this person to receive a medical operation,

 6    and that is very telling as to who Mr. Contreras is.

 7            And I'll conclude with this, Your Honor:

 8    Mr. Contreras is a very standup man, and more

 9    importantly, he is not someone that this Court needs to

10    be worried about.

11            I'll submit on that basis.  I do know that my

12    client would like to address the Court if that's okay,

13    Your Honor.

14            THE COURT:  We'll give him a chance after I've

15    heard from the Government?

16            MR. ROGERS:  Yes, Your Honor.

17            THE COURT:  Counsel....

18            MS. PINKEL:  Your Honor, because the Government

19    covered these issues extensively in his papers, I'm only

20    going to add a little bit in response to a couple of

21    points made in the defendant's under-seal sentencing

22    position.  There's information at page ten regarding

23    defendant's delay in coming forth to the Government

24    regarding references in the Hells Angels.  The

25    sentencing position is the first time the Government

1    heard this information.  We hadn't been told that

2    before.  Nonetheless, the delay in defendant's coming

3    forward was significant, and he may have been afraid;

4    but he -- as soon as the Government -- he had a reverse

5    proffer with the Government and knew the information the

6    Government had and immediately went and told at least

7    two co-conspirators about the Government's

8    investigation.  And the Government had to investigate

9    him for another 14 months; but, again, this -- this has

10   to do with the defendant's delay.  The delay -- he may

11   have been afraid, but he told his co-conspirators.

12           Additionally, there was a statement on page 11,

13   saying that the Government was surprised when informed

14   about the laundering of illegitimate money -- that's not

15   a true statement.  The Government had talked to multiple

16   witnesses, and had a plea agreement filed with the Court

17   for another essentially co-conspirator that we had that

18   information.  So we were not surprised when we heard

19   that information.  And that is again on page 11

20   regarding money laundering.  That was not new

21   information for us.

22           The last point I'm going to make is that the

23   defendant's -- defense cooperation was significant and

24   his early acceptance was significant, and that's why the

25   Government has moved under 5K1.1 and also for a *Booker*

```
 1   variance, but it is important for the Court to also
 2   consider under the 3553(a) factors sentencing disparity.
 3   And the Court will recall one month ago, the Court
 4   sentenced Mohammad Tirmazi who was one of the people to
 5   whom defendant was paying bribes.  Both of these
 6   defendants had the exact same guidelines range but for
 7   different reasons.  Tirmazi's -- Tirmazi's was slightly
 8   higher, because he was a public official, but
 9   defendant's -- defendant had a higher loss calculation,
10   because he was paying bribes to two public officials.
11   And he got a year and a day.  The pandemic has created
12   all sorts of complications housing defendants, and I
13   understand; but the need to avoid unwarranted sentencing
14   disparities would suggest that this defendant would
15   receive a sentence greater than the one that the Court
16   gave to Mr. Tirmazi.
17            THE COURT:  Counsel, talk to me about -- at
18   least for the record, do you recommend a four-level
19   reduction under the 5K1.
20            MS. PINKEL:  Yes, Your Honor, a four-level
21   reduction of the 5K1 and a four-level Booker variance
22   which would bring the defendant down to a Guidelines
23   range of 37 to 46 months.
24            THE COURT:  Counsel mentioned the defendant has
25   already paid 800,000?
```

```
 1              MS. PINKEL:  Yes, indeed, Your Honor, he has.
 2    821,000, which is --
 3              THE COURT:  More than the restitution, isn't
 4    it?
 5              MS. PINKEL:  Well, that's 600,000 in
 6    restitution to Los Angeles county and approximately
 7    $221,000 to the IRS.  So there's two amounts.
 8              THE COURT:  I'm sorry.  I missed the
 9    second amount, okay.
10              MS. PINKEL:  And the Court may recall
11    Mr. Tirmazi paid approximately somewhere in the range of
12    420,000 in advance.
13              THE COURT:  So let me just make sure, to the
14    county of Los Angeles, it was 600,000?
15              MS. PINKEL:  Yes, Your Honor.
16              THE COURT:  And the income tax was what?
17              MS. PINKEL:  For the IRS -- and this is
18    exclusive of any additional fines and penalties, it is
19    $221,366.
20              THE COURT:  So the total amount is 821,366?
21              MS. PINKEL:  Yes.
22              THE COURT:  Okay.
23              MS. PINKEL:  And, Your Honor, that is
24    significant, other -- that this defendant as Mr. Tirmazi
25    paid that much money in advance.
```

```
 1              THE COURT:  Okay.  So basically it has almost
 2   all been paid off?
 3              MS. PINKEL:  Yes, Your Honor.  We would
 4   consider the restitution -- at least the criminal
 5   restitution to L.A. county to be resolved by this and
 6   the IRS, except for fines and penalties.
 7              THE COURT:  Okay.  Okay.  Counsel, do you want
 8   to address anything first before I get to your client?
 9              MR. ROGERS:  Very briefly, Your Honor.  That
10   there's no evidence that Mr. Contreras ever solicited
11   any public official.  From what the Defense has seen,
12   Mr. Tirmazi solicited Mr. Contreras.  And yes,
13   Mr. Contreras paid every penny of restitution.  In
14   addition, Your Honor, Mr. Contreras did sign all closing
15   documents with the IRS, acknowledging the fines and
16   civil penalties with the IRS.  And he does intend to pay
17   all of that, as well, when he can.
18              THE COURT:  Okay.  Thank you, Counsel.
19   Mr. Contreras, do you wish to be heard?
20              THE DEFENDANT:  Yes.
21              THE COURT:  Okay.  You can speak from there or
22   you can speak from the podium wherever you want.
23              THE DEFENDANT:  I can go to the podium.  Is
24   that okay?
25              THE COURT:  Sure.
```

```
 1            THE DEFENDANT:  Thank you for allowing me to
 2    address the Court.  I stand before Your Honor shamefully
 3    aware that we are all here today because of what I have
 4    done.  I take full responsibility for my actions and the
 5    pain it has caused my children, my parents and family.
 6    I was motivated by providing for my family, keeping my
 7    employees busy and personal greed; however, I can assure
 8    this Court that this will never happen again.  Being
 9    indicted was a big change in my life.  I am now a
10    convicted felon with a damaged reputation for bribing
11    L.A. county employees.  It breaks my heart to see my
12    children, my parents, family in unbearable pain over
13    what I've done.  I have let them down.  My wife of
14    17 years has left me and divorced me and has gone
15    through major depression and mental issues, and she
16    doesn't see the kids a whole lot, and it is mostly
17    myself.  I'm broke, and my business is on the verge of
18    bankruptcy.  I still have to pay a lot of bills.  And I
19    want to continue to pay them.  For me, the greatest
20    punishment has already happened; but with all bad comes
21    some good things.  I'm much more aware of all my major
22    health issues like my asthmatic bronchitis, enlarged
23    heart and many more health issues.  That is why I'm --
24    I'm taking care of myself more and more, and I'm
25    obviously on more and more medications, and I'm very
```

1    afraid of this COVID-19 and the pandemic.  At this

2    point, I'm getting lots of treatment, practicing much

3    faith and establishing -- more involved with my

4    children.  I've also been able to see who my real true

5    friends are after hitting rock bottom.  I can't thank

6    them enough for their support and I'm very blessed and

7    grateful to have such report.  I want to thank you,

8    Your Honor, for all the time you spent in considering my

9    future.  I hope this Court will lend consideration to my

10   cooperation, the full restitution I paid in advance and

11   my health conditions.  Thank you, your Honor.  I am very

12   truly sorry.  I am very embarrassed, and I regret what I

13   have done.  I promise nothing like this will ever happen

14   again.

15              THE COURT:  Okay.  Thank you very much, sir.

16              THE DEFENDANT:  Thank you.

17              THE COURT:  Anything else from either side?

18              MR. ROGERS:  Not from the Defense, Your Honor.

19              MS. PINKEL:  No, Your Honor.

20              THE COURT:  Is there any legal cause why

21   sentence should not now be imposed?  I will go ahead and

22   sentence him at this time.  The Court is going to find

23   that the appropriate guideline level as suggested by the

24   presentence report is a level 29 category -- or excuse

25   me -- a level 29, Category 1 which is a range of 87 to

| | |
|---|---|
| 1 | 108 months.  The Court is going to accept the 5K1 of the |
| 2 | Government with a four-level reduction for a 5K1 with a |
| 3 | four-level reduction for a 5K1 with four levels for the |
| 4 | reasons stated in your position paper for 3553.  The |
| 5 | Court is going to find additional reduction in -- in the |
| 6 | guideline level.  I'm going to take it down to a level |
| 7 | 17; therefore -- which is 30 months.  Therefore, it is |
| 8 | ordered the defendant -- one of the reasons I'm doing |
| 9 | that is because of the disparate sentencing that is |
| 10 | involved, and also because of the fact that the |
| 11 | defendant has paid full restitution -- or basically full |
| 12 | restitution in this matter before his sentencing; |
| 13 | therefore, it is ordered the defendant shall pay to the |
| 14 | United States a special assessment of $200 which is due |
| 15 | immediately.  Any unpaid balance shall be due during the |
| 16 | period of imprisonment at the rate of no less than $25 |
| 17 | per quarter, pursuant to the Bureau of Prisons Inmate |
| 18 | Financial Responsibility Program.  It is ordered the |
| 19 | defendant shall pay restitution in the total amount of |
| 20 | $821,366, pursuant to Title 18 of the United States Code |
| 21 | Section 3663(a).  The amount of restitution order shall |
| 22 | be paid as follows:  600,000 to the county, which I |
| 23 | understand has already been paid.  And to the IRS |
| 24 | 221,366 of which all -- or at least part of that has |
| 25 | been paid. |

```
 1            MS. PINKEL:  Your Honor, I'm sorry.  That has
 2    just been paid with the clerk.  It's been deposited with
 3    the clerk of the court but not to the entities.
 4            THE COURT:  Okay.  Thank you.  Restitution
 5    shall be paid in full immediately, and restitution by --
 6    excuse me -- or the Court finds that from a
 7    consideration of the record that the defendant is now in
 8    a situation to allow for a full and immediate payment of
 9    restitution.  The defendant shall comply with
10    General Order 20-04.  There's an exception to that, is
11    there not of section what?  14?  With the exception
12    of -- yeah, with the exception of condition 14.  The
13    defendant shall comply with -- excuse me -- pursuant to
14    Title 18 United States Code Section 3612(f)(3)(A),
15    interest on the restitution order is waived because the
16    defendant does not -- does not have the ability to pay
17    such interest.  Payments may be subject to
18    defendant's -- which is probably moot in this case --
19    for default and delinquency, pursuant to
20    Title 18 United States Code Section 3612(g).  All fines
21    are waived as it is the found the defendant -- excuse
22    me -- it is found that such sanctions would place an
23    undue burden on the defendant's dependents.
24            Pursuant to Sentencing Reform Act of 1984, it
25    is the judgment of the Court, the defendant is hereby
```

1    committed on Count 1 and 2 of the indictment to the

2    custody of the Bureau of Prisons for a term of

3    24 months.  This term consists of 24 months on Count 1

4    and 24 months on count two, all such terms to run

5    concurrently.

6           Upon release from imprisonment, the defendant

7    shall be placed on supervised release for a term of

8    three years.  The term consists of three years in

9    Count 1, and 1 year on Count 2 of the information, all

10   such terms to run concurrently under the following terms

11   and conditions:  The defendant shall comply with the

12   rules and regulations of the United States Probation

13   Office and Pretrial Services Office and General Order

14   20-04, excluding condition 14 of Section 1 of that

15   order.

16          During the period of community supervision, the

17   defendant shall pay the special assessment and

18   restitution in accordance with this judgment's orders

19   pertaining to such payment.  The defendant shall apply

20   all monies received from any income tax refund, money

21   lottery winnings, inheritances, judgments or any other

22   form of financial gains to the Court-ordered financial

23   obligation.  The defendant shall cooperate in the

24   collection of a DNA sample from the defendant.  The

25   defendant shall refrain from any unlawful use of

```
1   controlled substance.  The defendant shall submit to one
2   drug test within 15 days of release from custody and at
3   least two periodic drug tests thereafter, not to exceed
4   eight drug tests per month as directed by the probation
5   department.
6           The defendant shall truthfully and timely file
7   and pay taxes owed for the years of conviction, and such
8   truthful and timely file -- and shall truthfully and
9   timely file and pay taxes during the period of community
10  supervision.
11          Further, defendant shall -- shall show proof to
12  the probation officer in compliance with this order.
13          Are you asking for a Southern California
14  designation, counsel?
15          MR. ROGERS:  Yes, Your Honor.
16          THE COURT:  The Court will make a
17  Southern California designation.  And this will be
18  forthwith in this particular matter.  If you wish to
19  appeal the sentence, it has to be done within 14 days of
20  today.  Anything else?
21          MR. ROGERS:  May I just be heard briefly,
22  Your Honor?
23          THE COURT:  Sure.
24          MR. ROGERS:  Will the Court be willing to allow
25  Mr. Contreras a 60 days surrender date?  He just needs
```

1    to clear up some medical issues, as well as some

2    business sense.

3         THE COURT:  Yeah, the Court -- just for the

4    record, this was continued from October 21st until

5    April 27th and then was continued till today, and the

6    Court does not seem -- does not find good cause to put

7    it over.  Thank you.  Have a good day.

8         MS. PINKEL:  Your Honor, just one more thing,

9    the defendant's right to appeal is restricted by an

10   appeal waiver in the plea agreement.

11        THE COURT:  That's in the plea agreement?

12        MS. PINKEL:  Yes.

13        THE COURT:  Okay.  Thank you.  That will be the

14   order of the Court.

15        COURTROOM DEPUTY:  Counsel, are you waiting for

16   the bond to be exonerated?

17        THE COURT:  The bond will be exonerated.

18        MS. PINKEL:  Thank you.

19             (Whereupon proceeding adjourned.)

20                      - - -

21

22

23

24

25

*C E R T I F I C A T E*

UNITED STATES OF AMERICA          :

                    vs.          :  No. CR 19-00257-RGK

ENRIQUE CONTRERAS                 :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

/S/_____          //____

MARIA R. BUSTILLOS                     DATE
OFFICIAL REPORTER

## $

**$200** [1] - 14:14
**$221,000** [1] - 10:7
**$221,366** [1] - 10:19
**$25** [1] - 14:16
**$821,366** [1] - 14:20
**$822,000** [1] - 5:19

## /

**/S** [1] - 19:22

## 1

**1** [6] - 13:25, 16:1, 16:3, 16:9, 16:14
**10-:07** [1] - 4:3
**108** [1] - 14:1
**11** [2] - 8:12, 8:19
**11TH** [1] - 2:6
**12254** [1] - 1:22
**14** [5] - 8:9, 15:11, 15:12, 16:14, 17:19
**15** [1] - 17:2
**17** [2] - 12:14, 14:7
**18** [3] - 14:20, 15:14, 15:20
**1801** [1] - 2:16
**19-00257-RGK** [3] - 1:10, 4:5, 19:6
**1984** [1] - 15:24
**1ST** [1] - 1:23

## 2

**2** [2] - 16:1, 16:9
**20-04** [2] - 15:10, 16:14
**2020** [2] - 1:18, 4:1
**213** [1] - 1:24
**213)894-6077** [1] - 2:7
**21st** [1] - 18:4
**221,366** [1] - 14:24
**24** [3] - 16:3, 16:4
**24TH** [1] - 2:17
**25** [1] - 7:2
**26** [1] - 5:2
**27** [2] - 1:18, 4:1
**27th** [1] - 18:5
**28** [1] - 19:13
**29** [2] - 13:24, 13:25

## 3

**30** [4] - 6:12, 6:14, 14:7
**310)281-2869** [1] - 2:18
**312** [1] - 2:6
**34** [1] - 5:3
**35** [1] - 5:4
**350** [1] - 1:23

**3553** [1] - 14:4
**3553(a** [1] - 9:2
**3612(f)(3)(A** [1] - 15:14
**3612(g)** [1] - 15:20
**3663(a)** [1] - 14:21
**37** [1] - 9:23

## 4

**4** [1] - 3:4
**4000** [1] - 2:11
**420,000** [1] - 10:12
**4455** [1] - 1:23
**46** [1] - 9:23

## 5

**5K1** [5] - 9:19, 9:21, 14:1, 14:2, 14:3
**5K1.1** [1] - 8:25

## 6

**60** [1] - 17:25
**600,000** [3] - 10:5, 10:14, 14:22
**615** [1] - 2:12

## 7

**753** [1] - 19:12

## 8

**800,000** [1] - 9:25
**821,000** [1] - 10:2
**821,366** [1] - 10:20
**87** [1] - 13:25
**894-2739** [1] - 1:24

## 9

**90012** [2] - 1:24, 2:7
**90067** [1] - 2:17
**92660** [1] - 2:13
**949)625-4487** [1] - 2:13

## A

**A.M** [1] - 4:3
**ability** [1] - 15:16
**able** [1] - 13:4
**ABOVE** [1] - 19:15
**ABOVE-ENTITLED** [1] - 19:15
**accept** [1] - 14:1
**acceptance** [2] - 5:23, 8:24
**accordance** [1] -

16:18
**acknowledging** [1] - 11:15
**Act** [1] - 15:24
**actions** [2] - 5:13, 12:4
**add** [1] - 7:20
**addendum** [1] - 5:3
**addition** [3] - 5:24, 6:3, 11:14
**additional** [1] - 10:18, 14:5
**additionally** [1] - 8:12
**address** [3] - 7:12, 11:8, 12:2
**adjourned** [1] - 18:19
**advance** [5] - 5:18, 5:19, 10:12, 10:25, 13:10
**afraid** [3] - 8:3, 8:11, 13:1
**age** [1] - 6:22
**ago** [1] - 9:3
**agreement** [3] - 8:16, 8:10, 18:11
**agrees** [1] - 5:22
**ahead** [1] - 13:21
**ailing** [1] - 6:17
**allow** [2] - 15:8, 17:24
**allowing** [1] - 12:1
**almost** [1] - 11:1
**alternate** [1] - 5:22
**AMERICA** [3] - 1:7, 2:4, 19:5
**America** [1] - 4:5
**amount** [4] - 10:9, 10:20, 14:19, 14:21
**amounts** [1] - 10:7
**AND** [3] - 19:10, 19:13, 19:15
**AND/OR** [1] - 19:19
**ANGELES** [5] - 1:17, 1:24, 2:7, 2:17, 4:1
**Angeles** [2] - 10:6, 10:14
**Angels** [1] - 7:24
**anonymously** [1] - 7:4
**ANY** [1] - 19:18
**apologetic** [1] - 5:16
**appeal** [3] - 17:19, 18:9, 18:10
**appearances** [1] - 4:6
**apply** [1] - 16:19
**appropriate** [1] - 13:23
**April** [1] - 18:5
**ARE** [1] - 19:19
**argued** [1] - 6:9
**assessment** [2] - 14:14, 16:17
**assure** [1] - 12:7
**asthma** [1] - 6:5
**asthmatic** [1] - 12:22
**AT** [1] - 4:3
**ATTORNEY** [1] - 2:5
**avoid** [1] - 9:13

**aware** [2] - 12:3, 12:21

## B

**bad** [1] - 12:20
**balance** [1] - 14:15
**bankruptcy** [1] - 12:18
**basis** [1] - 7:11
**BEACH** [1] - 2:13
**begging** [1] - 5:15
**behalf** [3] - 4:11, 4:14, 4:24
**BEHALF** [2] - 2:4, 2:9
**best** [1] - 6:12
**beyond** [1] - 5:23
**big** [1] - 12:9
**bills** [1] - 12:18
**bit** [1] - 7:20
**blame** [1] - 6:19
**blessed** [1] - 13:6
**bond** [2] - 18:16, 18:17
**Booker** [2] - 8:25, 9:21
**bottom** [1] - 13:5
**BOULEVARD** [1] - 2:11
**breaks** [1] - 12:11
**bribes** [2] - 9:5, 9:10
**bribing** [1] - 12:10
**briefly** [2] - 11:9, 17:21
**bring** [1] - 9:22
**broke** [1] - 12:17
**bronchitis** [1] - 12:22
**building** [1] - 6:23
**burden** [1] - 15:23
**Bureau** [2] - 14:17, 16:2
**business** [4] - 6:19, 6:24, 12:17, 18:2
**BUSTILLOS** [3] - 1:21, 19:10, 19:23
**busy** [1] - 12:7
**BY** [3] - 2:5, 2:11, 2:16

## C

**C.S.R** [1] - 1:22
**CA** [3] - 2:7, 2:13, 2:17
**calculation** [1] - 9:9
**calendar** [1] - 4:4
**California** [2] - 17:13, 17:17
**CALIFORNIA** [5] - 1:2, 1:17, 1:24, 4:1, 19:12
**cannot** [1] - 5:21
**cans** [1] - 6:22
**care** [1] - 12:24
**case** [2] - 6:17, 15:18
**category** [1] - 13:24
**Category** [1] - 13:25
**caused** [1] - 12:5
**centered** [1] - 7:1
**CENTRAL** [1] - 1:2,

19:11
**CENTURY** [1] - 2:16
**certain** [1] - 6:14
**CERTIFY** [1] - 19:12
**chance** [1] - 7:14
**change** [1] - 12:9
**CHARGED** [1] - 19:18
**check** [2] - 6:13, 6:15
**children** [5] - 6:16, 6:19, 12:5, 12:12, 13:4
**CIRCUIT** [1] - 19:18
**civil** [1] - 11:16
**clear** [1] - 18:1
**clerk** [2] - 15:2, 15:3
**client** [2] - 7:12, 11:8
**closing** [1] - 11:14
**co** [3] - 8:7, 8:11, 8:17
**co-conspirator** [1] - 8:17
**co-conspirators** [2] - 8:7, 8:11
**Code** [3] - 14:20, 15:14, 15:20
**CODE** [1] - 19:13
**collecting** [1] - 6:22
**collection** [1] - 16:24
**comfortable** [1] - 4:16
**coming** [2] - 7:23, 8:2
**committed** [1] - 16:1
**community** [2] - 16:16, 17:9
**compassionate** [1] - 6:9
**compliance** [1] - 17:12
**complications** [1] - 9:12
**comply** [3] - 15:9, 15:13, 16:11
**concerned** [1] - 5:9
**conclude** [1] - 7:7
**concurrently** [2] - 16:5, 16:10
**condition** [2] - 15:12, 16:14
**conditions** [2] - 13:11, 16:11
**CONFERENCE** [2] - 19:17, 19:20
**CONFORMANCE** [2] - 19:16, 19:19
**consider** [2] - 9:2, 11:4
**consideration** [3] - 5:21, 13:9, 15:7
**considered** [1] - 4:20
**considering** [1] - 13:8
**consists** [2] - 16:3, 16:8
**conspirator** [1] - 8:17
**conspirators** [2] - 8:7, 8:11
**continue** [1] - 12:19
**continued** [2] - 18:4, 18:5

contrary [1] - 7:1
Contreras [19] - 4:6, 4:11, 4:14, 5:18, 5:19, 5:24, 6:4, 6:8, 6:11, 6:13, 6:25, 7:4, 7:6, 11:10, 11:12, 11:13, 11:14, 11:19, 17:25
CONTRERAS [3] - 1:12, 2:10, 19:7
contreras [1] - 7:8
controlled [1] - 17:1
convicted [1] - 12:10
conviction [1] - 17:7
cooperate [1] - 16:23
cooperated [1] - 5:24
cooperation [2] - 8:23, 13:10
CORRECT [1] - 19:14
Counsel [3] - 4:6, 4:9, 11:18
counsel [7] - 4:12, 5:8, 9:17, 9:24, 11:7, 17:14, 18:15
counsel... [1] - 7:17
Count [4] - 16:1, 16:3, 16:9
count [2] - 6:10, 16:4
county [5] - 10:6, 10:14, 11:5, 12:11, 14:22
couple [1] - 7:20
Court [27] - 4:19, 5:6, 5:14, 6:21, 7:2, 7:9, 7:12, 8:16, 9:1, 9:3, 9:15, 10:10, 12:2, 12:8, 13:9, 13:22, 14:1, 14:5, 15:6, 15:25, 16:22, 17:16, 17:24, 18:3, 18:6, 18:14
COURT [36] - 1:1, 1:21, 4:3, 4:9, 4:12, 4:15, 5:5, 5:8, 5:12, 7:14, 7:17, 9:17, 9:24, 10:3, 10:8, 10:13, 10:16, 10:20, 10:22, 11:1, 11:7, 11:18, 11:21, 11:25, 13:15, 13:17, 13:20, 15:4, 17:16, 17:23, 18:3, 18:11, 18:13, 18:17, 19:10, 19:11
court [3] - 6:10, 6:25, 15:3
Court-ordered [1] - 16:22
COURTHOUSE [1] - 1:22
COURTROOM [2] - 4:4, 18:15
covered [1] - 7:19
COVID-19 [3] - 6:4, 6:7, 13:1
CR [3] - 1:10, 4:5, 19:6
created [1] - 9:11

criminal [1] - 11:4
custody [2] - 16:2, 17:2

D

damaged [1] - 12:10
DATE [1] - 19:23
date [1] - 17:25
days [3] - 17:2, 17:19, 17:25
default [1] - 15:19
Defendant [1] - 1:13
defendant [26] - 9:5, 9:9, 9:14, 9:22, 9:24, 10:24, 14:8, 14:11, 14:13, 14:19, 15:7, 15:9, 15:13, 15:16, 15:21, 15:25, 16:6, 16:11, 16:17, 16:19, 16:23, 16:24, 16:25, 17:1, 17:6, 17:11
DEFENDANT [4] - 11:20, 11:23, 12:1, 13:16
defendant's [10] - 4:21, 7:21, 7:23, 8:2, 8:10, 8:23, 9:9, 15:18, 15:23, 18:9
DEFENDANTS [1] - 2:9
defendants [3] - 5:14, 9:6, 9:12
defense [1] - 8:23
Defense [3] - 4:24, 11:11, 13:18
Defense's [1] - 6:2
delay [4] - 7:23, 8:2, 8:10
delinquency [1] - 15:19
department [1] - 17:5
dependents [1] - 15:23
DEPOSIT [1] - 19:19
deposited [1] - 15:2
depression [1] - 12:15
DEPUTY [2] - 4:4, 18:15
designation [2] - 17:14, 17:17
different [1] - 9:7
directed [1] - 17:4
discussed [1] - 6:2
disease [1] - 6:5
disparate [1] - 14:9
disparities [1] - 9:14
disparity [1] - 9:2
display [1] - 5:23
DISTRICT [5] - 1:1, 1:2, 1:5, 19:11
DIVISION [1] - 1:3
divorced [1] - 12:14
DNA [1] - 16:24
DO [1] - 19:12

docket [3] - 5:2, 5:3, 5:4
documents [2] - 4:20, 11:15
dollar [1] - 6:24
donated [1] - 7:4
done [4] - 12:4, 12:13, 13:13, 17:19
down [3] - 9:22, 12:13, 14:6
downward [1] - 6:18
drug [3] - 17:2, 17:3, 17:4
due [2] - 14:14, 14:15
during [3] - 14:15, 16:16, 17:9

E

early [1] - 8:24
EAST [2] - 2:12, 2:16
effects [1] - 6:7
eight [1] - 17:4
either [1] - 13:17
embarrassed [1] - 13:12
employees [3] - 6:12, 12:7, 12:11
enlarged [1] - 12:22
ENRIQUE [3] - 1:12, 2:10, 19:7
Enrique [1] - 4:5
entities [1] - 15:3
ENTITLED [1] - 19:15
ESQ [2] - 2:11, 2:16
essentially [1] - 8:17
establishing [1] - 13:3
evidence [1] - 11:10
ex [1] - 6:23
ex-wife [1] - 6:23
exact [1] - 9:6
exceed [1] - 17:3
except [1] - 11:6
exception [3] - 15:10, 15:11, 15:12
excluding [1] - 16:14
exclusive [1] - 10:18
excuse [4] - 13:24, 15:6, 15:13, 15:21
exonerated [2] - 18:16, 18:17
extensively [2] - 5:25, 7:19

F

fact [1] - 14:10
factors [1] - 9:2
faith [1] - 13:3
families [1] - 6:14
family [4] - 6:11, 12:5, 12:6, 12:12
far [1] - 5:9
fatal [1] - 6:6
father [2] - 6:17, 6:22

FEE [1] - 19:18
FEES [1] - 19:18
felon [1] - 12:9
file [3] - 17:6, 17:8, 17:9
filed [1] - 8:16
financial [1] - 16:22
Financial [1] - 14:18
fine [1] - 4:17
fines [4] - 14:10, 11:6, 11:15, 15:20
first [2] - 7:25, 11:8
FLOOR [2] - 2:6, 2:17
following [1] - 16:10
follows [1] - 14:22
FOR [3] - 19:10, 19:11, 19:18
FOREGOING [1] - 19:13
forgiveness [1] - 5:15
form [1] - 16:22
FORMAT [1] - 19:16
forth [1] - 7:23
forthwith [1] - 17:18
forward [1] - 8:3
four [7] - 4:5, 9:18, 9:20, 9:21, 14:2, 14:3
four-level [5] - 9:18, 9:20, 9:21, 14:2, 14:3
friends [2] - 6:11, 13:5
full [6] - 12:4, 13:10, 14:11, 15:5, 15:8
future [1] - 13:9

G

gains [1] - 16:22
GARY [1] - 1:5
General [2] - 15:10, 16:13
Government [14] - 5:22, 5:25, 7:15, 7:18, 7:23, 7:25, 8:4, 8:5, 8:6, 8:8, 8:13, 8:15, 8:25, 14:2
Government's [2] - 4:21, 8:7
grateful [1] - 13:7
greater [1] - 9:15
greatest [1] - 12:19
greed [1] - 12:7
guideline [2] - 13:23, 14:6
guidelines [1] - 9:6
Guidelines [1] - 9:22

H

hard [1] - 6:20
health [3] - 12:22, 12:23, 13:11
heard [6] - 5:9, 7:15, 8:1, 8:18, 11:19,

17:21
HEARING [2] - 1:16, 3:4
heart [3] - 6:5, 12:11, 12:23
HELD [1] - 19:15
Hells [1] - 7:24
hereby [1] - 15:25
HEREBY [1] - 19:12
higher [3] - 9:8, 9:9
hitting [1] - 13:5
Honor [28] - 4:7, 4:10, 4:13, 4:25, 5:1, 5:10, 5:11, 6:3, 7:7, 7:13, 7:16, 7:18, 9:20, 10:1, 10:15, 10:23, 11:3, 11:9, 11:14, 12:2, 13:8, 13:11, 13:18, 13:19, 15:1, 17:15, 17:22, 18:8
HONORABLE [1] - 1:5
hope [1] - 13:9
hopes [1] - 5:15
host [1] - 6:5
housing [1] - 9:12

I

illegitimate [1] - 8:14
immediate [1] - 15:8
immediately [3] - 8:6, 14:15, 15:5
important [1] - 9:1
importantly [2] - 6:12, 7:9
imposed [1] - 13:21
imprisonment [2] - 14:16, 16:6
IN [5] - 4:3, 19:10, 19:15, 19:16, 19:19
income [2] - 10:16, 16:20
indeed [1] - 10:1
indicted [1] - 12:9
indictment [1] - 16:1
individual [1] - 7:4
individuals [3] - 5:19, 6:14, 7:2
information [7] - 7:22, 8:1, 8:5, 8:18, 8:19, 8:21, 16:9
informed [1] - 8:13
inheritances [1] - 16:21
Inmate [1] - 14:17
intend [1] - 11:16
interest [2] - 15:15, 15:17
investigate [1] - 8:8
investigation [1] - 8:8
involved [2] - 13:3, 14:10
IRS [6] - 10:7, 10:17, 11:6, 11:15, 11:16, 14:23

**IS** [2] - 19:13, 19:16
**issues** [7] - 6:6, 6:8, 7:19, 12:15, 12:22, 12:23, 18:1
**item** [1] - 4:4

### J

**JOHN** [2] - 2:10, 2:11
**John** [1] - 4:11
**JUDGE** [1] - 1:5
**judgment** [1] - 15:25
**judgment's** [1] - 16:18
**judgments** [1] - 16:21
**JUDICIAL** [2] - 19:17, 19:20
**JULY** [2] - 1:18, 4:1

### K

**keeping** [1] - 12:6
**kids** [1] - 12:16
**KLAUSNER** [1] - 1:5

### L

**L.A** [2] - 11:5, 12:11
**last** [1] - 8:22
**laundering** [2] - 8:14, 8:20
**LAW** [2] - 2:10, 2:15
**least** [5] - 8:6, 9:18, 11:4, 14:24, 17:3
**left** [1] - 12:14
**legal** [1] - 13:20
**lend** [1] - 13:9
**lenient** [1] - 5:15
**LESS** [1] - 19:18
**less** [1] - 14:16
**letters** [2] - 7:2, 7:3
**level** [10] - 9:18, 9:20, 9:21, 13:23, 13:24, 13:25, 14:2, 14:3, 14:6
**levels** [1] - 14:3
**life** [2] - 6:21, 12:9
**look** [1] - 4:23
**looks** [1] - 6:16
**LOS** [5] - 1:17, 1:24, 2:7, 2:17, 4:1
**Los** [2] - 10:6, 10:14
**losing** [1] - 6:19
**loss** [2] - 6:20, 9:9
**lost** [1] - 6:18
**lottery** [1] - 16:21
**louder** [1] - 5:13

### M

**MACARTHUR** [1] - 2:11
**major** [2] - 12:15, 12:21

**man** [1] - 7:8
**MARIA** [3] - 1:21, 19:10, 19:23
**marriage** [2] - 6:18, 6:20
**matter** [3] - 4:19, 14:12, 17:18
**MATTER** [1] - 19:15
**medical** [4] - 6:5, 6:8, 7:5, 18:1
**medications** [1] - 12:25
**memorandum** [1] - 6:2
**mental** [1] - 12:15
**mentioned** [1] - 9:24
**midst** [2] - 6:3, 6:15
**missed** [1] - 10:8
**Mohammad** [1] - 9:4
**MONDAY** [2] - 1:18, 4:1
**money** [5] - 7:5, 8:14, 8:20, 10:25, 16:20
**monies** [1] - 16:20
**month** [2] - 9:3, 17:4
**months** [7] - 8:9, 9:23, 14:1, 14:7, 16:3, 16:4
**moot** [1] - 15:18
**morning** [3] - 4:7, 4:10, 4:13
**most** [1] - 6:11
**mostly** [1] - 12:16
**motions** [1] - 6:10
**motivated** [1] - 12:6
**moved** [1] - 8:25
**MR** [11] - 4:10, 4:13, 4:24, 5:10, 5:13, 7:16, 11:9, 13:18, 17:15, 17:21, 17:24
**MS** [18] - 4:7, 5:1, 5:6, 7:18, 9:20, 10:1, 10:5, 10:10, 10:15, 10:17, 10:21, 10:23, 11:3, 13:19, 15:1, 18:8, 18:12, 18:18
**multimillion** [1] - 6:24
**multimillion-dollar** [1] - 6:24
**multiple** [2] - 4:20, 8:15

### N

**need** [1] - 9:13
**needs** [2] - 7:9, 17:25
**never** [1] - 12:8
**new** [1] - 8:20
**NEWPORT** [1] - 2:13
**nonetheless** [1] - 8:2
**NORTH** [1] - 2:6
**nothing** [2] - 6:17, 13:13
**number** [1] - 4:4

### O

**obligation** [1] - 16:23
**obviously** [1] - 12:25
**October** [1] - 18:4
**OF** [16] - 1:2, 1:7, 1:15, 2:4, 2:4, 2:9, 2:10, 2:15, 19:5, 19:11, 19:14, 19:17, 19:20
**Office** [2] - 16:13
**OFFICE** [2] - 2:4, 2:15
**officer** [1] - 17:12
**OFFICES** [1] - 2:10
**OFFICIAL** [3] - 1:21, 19:10, 19:23
**official** [2] - 9:8, 11:11
**officials** [1] - 9:10
**often** [1] - 6:9
**ON** [2] - 2:4, 2:9
**one** [8] - 6:24, 7:3, 9:3, 9:4, 9:15, 14:8, 17:1, 18:8
**operation** [1] - 7:5
**order** [5] - 14:21, 15:15, 16:15, 17:12, 18:14
**Order** [2] - 15:10, 16:13
**ordered** [4] - 14:8, 14:13, 14:18, 16:22
**orders** [1] - 16:18
**owed** [1] - 17:7

### P

**PAGE** [2] - 3:3, 19:16
**page** [3] - 7:22, 8:12, 8:19
**paid** [13] - 5:19, 9:25, 10:11, 10:25, 11:2, 11:13, 13:10, 14:11, 14:22, 14:23, 14:25, 15:2, 15:5
**pain** [2] - 12:5, 12:12
**pandemic** [4] - 6:4, 6:15, 9:11, 13:1
**paper** [1] - 14:4
**papers** [4] - 4:21, 4:22, 7:19
**parents** [2] - 12:5, 12:12
**PARK** [1] - 2:16
**part** [1] - 14:24
**participated** [1] - 5:25
**particular** [2] - 4:18, 17:18
**pay** [11] - 5:17, 6:23, 11:16, 12:18, 12:19, 14:13, 14:19, 15:16, 16:17, 17:7, 17:9
**paying** [2] - 9:5, 9:10
**payment** [2] - 15:8, 16:19
**payments** [1] - 15:17
**penalties** [3] - 10:18,

11:6, 11:16
**penny** [1] - 11:13
**people** [2] - 6:10, 9:4
**per** [2] - 14:17, 17:4
**period** [3] - 14:16, 16:16, 17:9
**periodic** [1] - 17:3
**person** [1] - 7:5
**personal** [1] - 12:7
**pertaining** [1] - 16:19
**PETER** [2] - 2:15, 2:16
**Peter** [1] - 4:14
**PINKEL** [19] - 2:5, 4:7, 5:1, 5:6, 7:18, 9:20, 10:1, 10:5, 10:10, 10:15, 10:17, 10:21, 10:23, 11:3, 13:19, 15:1, 18:8, 18:12, 18:18
**Pinkel** [1] - 4:8
**place** [1] - 15:22
**placed** [1] - 16:7
**Plaintiffs** [1] - 1:8
**PLAINTIFFS** [1] - 2:4
**plea** [3] - 8:16, 18:10, 18:11
**podium** [4] - 4:17, 11:22, 11:23
**point** [2] - 8:22, 13:2
**points** [1] - 7:21
**position** [5] - 4:21, 7:22, 7:25, 14:4
**practicing** [1] - 13:2
**presentence** [2] - 4:20, 13:24
**PRESIDING** [1] - 1:5
**Pretrial** [1] - 16:13
**Prisons** [2] - 14:17, 16:2
**Probation** [1] - 16:12
**probation** [2] - 17:4, 17:12
**proceeding** [1] - 18:19
**PROCEEDINGS** [2] - 1:15, 19:15
**proffer** [2] - 6:1, 8:5
**Program** [1] - 14:18
**promise** [1] - 13:13
**proof** [1] - 17:11
**providing** [1] - 12:6
**PSR** [2] - 5:2, 5:3
**public** [3] - 9:8, 9:10, 11:11
**punishment** [1] - 12:20
**PURSUANT** [1] - 19:12
**pursuant** [5] - 14:17, 14:20, 15:13, 15:19, 15:24
**put** [1] - 18:6

### Q

**quarter** [1] - 14:17

**quite** [2] - 6:13, 7:1
**quoted** [1] - 6:9

### R

**range** [4] - 9:6, 9:23, 10:11, 13:25
**rate** [1] - 14:16
**rather** [1] - 4:17
**read** [1] - 4:19
**real** [1] - 13:4
**reasons** [3] - 9:7, 14:4, 14:8
**receive** [2] - 7:5, 9:15
**received** [2] - 7:2, 6:20
**recommend** [1] - 9:18
**record** [4] - 5:1, 9:18, 15:7, 18:4
**REDUCTION** [1] - 19:19
**reduction** [5] - 9:19, 9:21, 14:2, 14:3, 14:5
**references** [1] - 7:24
**Reform** [1] - 15:24
**refrain** [1] - 16:25
**refund** [1] - 16:20
**regarding** [3] - 7:22, 7:24, 8:20
**regret** [1] - 13:12
**REGULATIONS** [2] - 19:16, 19:20
**regulations** [1] - 16:12
**release** [4] - 6:10, 16:6, 16:7, 17:2
**rent** [1] - 6:23
**report** [3] - 4:20, 13:7, 13:24
**REPORTED** [1] - 19:14
**REPORTER** [3] - 1:21, 19:10, 19:23
**REPORTER'S** [1] - 1:15
**reputation** [1] - 12:10
**resolved** [1] - 11:5
**response** [1] - 7:20
**Responsibility** [1] - 14:18
**responsibility** [2] - 5:23, 12:4
**restitution** [17] - 5:17, 5:20, 10:3, 10:6, 11:4, 11:5, 11:13, 13:10, 14:11, 14:12, 14:19, 14:21, 15:4, 15:5, 15:9, 15:15, 16:18
**restricted** [1] - 18:9
**reverse** [1] - 8:4
**reviewed** [1] - 5:6
**revised** [1] - 5:3
**rock** [1] - 13:5
**ROGERS** [12] - 2:10,

2:11, 4:10, 4:24,
5:10, 5:13, 7:16,
11:9, 13:18, 17:15,
17:21, 17:24
*Rogers* [1] - 4:11
*rules* [1] - 16:12
*run* [2] - 16:4, 16:10
*RUTH* [2] - 2:5
*Ruth* [1] - 4:8

**S**

*sample* [1] - 16:24
*sanctions* [1] - 15:22
*seal* [1] - 7:21
*SEBASTIAN* [3] -
2:15, 2:16, 4:13
*Sebastian* [1] - 4:14
*second* [1] - 10:9
*SECTION* [1] - 19:12
*section* [1] - 15:11
*Section* [4] - 14:21,
15:14, 15:20, 16:14
*see* [4] - 6:21, 12:11,
12:16, 13:4
*seem* [1] - 18:6
*self* [1] - 7:1
*self-centered* [1] - 7:1
*selfish* [1] - 6:25
*sense* [1] - 18:2
*sentence* [5] - 5:16,
9:15, 13:21, 13:22,
17:19
*sentenced* [1] - 9:4
*sentencing* [12] - 4:16,
4:19, 4:23, 5:9, 5:20,
6:2, 7:21, 7:25, 9:2,
9:13, 14:9, 14:12
*SENTENCING* [2] -
1:16, 3:4
*Sentencing* [1] - 15:24
*separate* [1] - 6:1
*Services* [1] - 16:13
*SESSION* [1] - 4:3
*sessions* [1] - 6:1
*set* [2] - 4:15, 4:19
*shall* [18] - 14:13,
14:15, 14:19, 14:21,
15:5, 15:9, 15:13,
16:7, 16:11, 16:17,
16:19, 16:23, 16:25,
17:1, 17:6, 17:8,
17:11
*shamefully* [1] - 12:2
*show* [1] - 17:11
*side* [1] - 13:17
*sign* [1] - 11:14
*significant* [4] - 8:3,
8:23, 8:24, 10:24
*sitting* [1] - 4:16
*situation* [1] - 15:8
*six* [1] - 5:25
*slightly* [1] - 9:7
*solicited* [2] - 11:10,
11:12

*someone* [1] - 7:9
*somewhere* [1] -
10:11
*soon* [1] - 8:4
*sorry* [4] - 5:16, 10:8,
13:12, 15:1
*sorts* [1] - 9:12
*Southern* [2] - 17:13,
17:17
*special* [2] - 14:14,
16:17
*spent* [1] - 13:8
*spiral* [1] - 6:18
*SPRING* [1] - 2:6
*stand* [2] - 5:14, 12:2
*standup* [1] - 7:8
*state* [2] - 4:6, 5:2
*statement* [2] - 8:12,
8:15
*STATES* [10] - 1:1,
1:7, 1:22, 2:4, 19:5,
19:11, 19:13, 19:17,
19:20
*States* [7] - 4:5, 4:8,
14:14, 14:20, 15:14,
15:20, 16:12
*STENOGRAPHICAL
LY* [1] - 19:14
*still* [1] - 12:18
*STREET* [2] - 1:23, 2:6
*subject* [2] - 6:1,
15:17
*submit* [2] - 7:11, 17:1
*submitted* [1] - 4:22
*substance* [1] - 17:1
*suffers* [2] - 6:4, 6:8
*suggest* [1] - 9:14
*suggested* [1] - 13:23
*SUITE* [2] - 1:23, 2:12
*supervised* [1] - 16:7
*supervision* [2] -
16:16, 17:10
*support* [1] - 13:6
*surprised* [2] - 8:13,
8:18
*surrender* [1] - 17:25
*susceptible* [1] - 6:6
*symptoms* [1] - 6:7

**T**

*tax* [2] - 10:16, 16:20
*taxes* [2] - 17:7, 17:9
*ten* [1] - 7:22
*term* [4] - 16:2, 16:3,
16:7, 16:8
*terms* [2] - 16:4, 16:10
*test* [1] - 17:2
*tests* [2] - 17:3, 17:4
*THAT* [2] - 19:12,
19:15
*THE* [50] - 2:4, 2:4,
2:9, 4:9, 4:12, 4:15,
5:5, 5:8, 5:12, 7:14,
7:17, 9:17, 9:24,

10:3, 10:8, 10:13,
10:16, 10:20, 10:22,
11:1, 11:7, 11:18,
11:20, 11:21, 11:23,
11:25, 12:1, 13:15,
13:16, 13:17, 13:20,
15:4, 17:16, 17:23,
18:3, 18:11, 18:13,
18:17, 19:10, 19:11,
19:13, 19:14, 19:15,
19:16, 19:17, 19:19,
19:20
*thereafter* [1] - 17:3
*therefore* [3] - 14:7,
14:13
*THIS* [1] - 19:18
*three* [2] - 5:7, 16:8
*timely* [3] - 17:6, 17:8,
17:9
*Tirmazi* [5] - 9:4, 9:16,
10:11, 10:24, 11:12
*Tirmazi's* [2] - 9:7
*Title* [3] - 14:20, 15:14,
15:20
*TITLE* [1] - 19:13
*TO* [1] - 19:12
*today* [4] - 4:19, 12:3,
17:20, 18:5
*total* [2] - 10:20, 14:19
*TOWER* [1] - 2:12
*TRANSCRIPT* [4] -
1:15, 19:14, 19:16,
19:18
*treatment* [1] - 13:2
*tries* [1] - 6:12
*true* [2] - 8:15, 13:4
*TRUE* [1] - 19:13
*truly* [1] - 13:12
*truthful* [1] - 17:8
*truthfully* [2] - 17:6,
17:8
*two* [5] - 8:7, 9:10,
10:7, 16:4, 17:3

**U**

*unbearable* [1] - 12:12
*under* [5] - 7:21, 8:25,
9:2, 9:19, 16:10
*under-seal* [1] - 7:21
*undue* [1] - 15:23
*UNITED* [10] - 1:1, 1:7,
1:22, 2:4, 19:5,
19:11, 19:13, 19:17,
19:20
*United* [7] - 4:5, 4:8,
14:14, 14:20, 15:14,
15:20, 16:12
*unlawful* [1] - 16:25
*unnoticed* [1] - 5:21
*unpaid* [1] - 14:15
*unwarranted* [1] -
9:13
*up* [1] - 18:1

**V**

*variance* [2] - 9:1,
9:21
*verge* [2] - 6:19, 12:17
*vs* [2] - 1:10, 19:6

**W**

*waiting* [1] - 18:15
*waived* [2] - 15:15,
15:21
*waiver* [1] - 18:10
*WEST* [1] - 1:23
*WESTERN* [1] - 1:3
*whole* [2] - 6:21, 12:16
*wife* [2] - 6:23, 12:13
*willing* [1] - 17:24
*winnings* [1] - 16:21
*wish* [3] - 5:8, 11:19,
17:18
*WITH* [2] - 19:16,
19:19
*witnesses* [1] - 8:16
*words* [2] - 5:14, 5:23
*worried* [1] - 7:10
*worthy* [1] - 5:21

**Y**

*year* [2] - 9:11, 16:9
*years* [4] - 12:14, 16:8,
17:7
*young* [1] - 6:22